[Civil No. 1088. Filed January 27, 1913. On motion for rehearing, April 16, 1914.]

[139 Pac. 879.]

ALBERT STEINFELD and HIRAM W. FENNER, Receiver of THE NIELSEN MINING & SMELTING COMPANY, a Corporation, Now Known as and Called the SILVER BELL COPPER COMPANY, a Corporation, Appellants, v. MARY NIELSEN, Administratrix of the Estate of CARL S. NIELSEN, Deceased, and MARY NIELSEN, in Her Own Personal Right, Appellee.

1. CORPORATIONS — STOCK — PURCHASE BY DIRECTOR.—In absence of special circumstances requiring a corporate officer or director to divulge information as to the company's affairs, he may purchase stock from a stockholder without doing so, if he does not actively mislead the stockholder.

2. CORPORATIONS—SALE OF STOCK—FRAUD—SUFFICIENCY OF EVIDENCE. Evidence, in an action to set aside a sale of stock in a mining corporation on the ground of fraud by the purchaser, *held* not to show actionable fraud justifying setting the sale aside.

3. CORPORATIONS—SALE OF STOCK—FRAUD.—It was not the duty of one who dominated the affairs of a corporation, by reason of his power of selling its property for debts, to use his personal credit to pay its debts or to extend its credit in order to relieve a stockholder of the necessity of selling his stock, which was purchased by such person.

4. CORPORATIONS—STOCK—PURCHASE BY DIRECTOR.—Directors of a corporation owe a fiduciary duty to its stockholders in dealings which affect the stock.

5. CORPORATIONS—STOCK—VALIDITY OF SALES—SUFFICIENCY OF EVIDENCE—CONSIDERATION.—Evidence, in an action to set aside a sale of corporate stock on the ground of fraud in inducing its sale, *held* to show that the consideration for the sale was not inadequate.

6. SALES—RESCISSION—GROUNDS OF RELIEF—FRAUD.—A sale will only be set aside in equity for inadequacy of price, where such inadequacy is so gross as to shock the conscience and be decisive evidence of fraud.

## ON MOTION FOR REHEARING.

7. APPEAL AND ERROR — REHEARING — LEAVE OF COURT.—Under the supreme court rules as amended, a motion for rehearing cannot be filed without leave of the supreme court.

8. APPEAL AND ERROR—NOTICE OF APPEAL—MATTERS REVIEWABLE.—A notice of appeal, reciting that defendants excepted to the court's ruling in rendering judgment for plaintiff and in overruling defendants' motion for a new trial herein, and give notice of appeal to the supreme court, brought up for review both the judgment and order denying a motion for new trial,

9. APPEAL AND ERROR—REVIEW OF JUDGMENT.—Revised Statutes of 1887, paragraph 846, permits an appeal or writ of error to be taken to the supreme court from any final judgment of the district court in civil cases; but paragraph 593 provides that on appeal from a judgment the supreme court may review an order granting or refusing a new trial, sustaining or overruling a demurrer, or affecting a substantial right. Revised Statutes of 1901, paragraph 1493, provides that an appeal or writ of error may be taken to the supreme court from any final judgment of the district court in civil cases, "and from any of the orders mentioned in section 1214 which the supreme court has jurisdiction to review." *Held*, that, where the notice of appeal embraced both the judgment and the order overruling a motion for new trial, the failure of the appeal bond to recite the order overruling the motion for new trial would not destroy the jurisdiction of the supreme court to review the judgment and such intermediate orders as necessarily affected it, but merely prevented it from also reviewing the order denying a new trial.

10. APPEAL AND ERROR—REPEAL—RETROACTIVE OPERATION—STATUTES AFFECTING REMEDIES.—Senate Bill No. 108 (sec. 1231, Rev. Stats. Ariz. 1913, Civil Code), section 6, provides that upon appeal from a final judgment the court shall review all orders and rulings which are assigned as error, whether a motion for new trial is made or not, and if such motion be made and denied, the court may, on appeal from final judgment, review the action denying such motion, though no appeal be taken from the order denying the motion. The same legislature enacted section 5560 as Senate Bill No. 108, which provided that no action commenced before any repealing act takes effect and no right accrued is affected by the provisions of such act, but proceedings therein must conform to the requirements of the acts passed by the same session of the legislature, so far as such last mentioned acts are applicable. *Held*, that appellee, in an action in which judgment had been rendered when section 6 was enacted, did not have a vested right in the method of taking and perfecting an appeal, so that that section would apply to authorize the supreme court to review an order denying the motion for new trial, though appellant had only perfected an appeal from the judgment under the existing statutes.

11. APPEAL AND ERROR—MOTION FOR NEW TRIAL—NECESSITY—TERRITORIAL COURTS.—Under Constitution, article 22, section 7, providing that the records and proceedings of the territorial district courts shall pass to the possession and jurisdiction of the superior courts of the county, Senate Bill No. 108 (sec. 1231, Rev. Stats. Ariz. 1913, Civil Code), section 6, providing that upon appeal from a final judgment the court shall review all orders of the trial court which were assigned as error, whether motion for new trial is made or not, is applicable to judgments of the territorial district courts.

12. CONSTITUTIONAL LAW—"VESTED RIGHT."—A "vested right" is an immediate fixed right to present or future enjoyment, where the interest does not depend on a period or an event that is uncertain.

13. STATUTES—RETROACTIVE OPERATION—STATUTES AFFECTING REMEDY. If a statute providing a remedy is repealed pending a proceeding, such proceeding is thereby determined, unless the repealing statute otherwise provides; and if it be amended, the judgment in such proceeding must conform to the statute as amended.

APPEAL from a judgment of the District Court of the First Judicial District, in and for the County of Pima. John H. Campbell, Judge. Reversed and remanded.

STATEMENT OF FACTS BY THE COURT.

This action was brought against the appellants in the district court of Pima county in June, 1905, by the appellee, Mary Nielsen, individually, and as the administratrix of the

estate of Carl S. Nielsen, deceased. Among other things, the complaint prays that a certain sale, made by Carl S. Nielsen and Mary Nielsen to Albert Steinfeld, of 300 shares of the capital stock of the defendant corporation should be set aside as fraudulent, and the plaintiff have judgment for said stock and for $33,000 dividend theretofore paid thereon and received by said Steinfeld. Judgment was rendered in the lower court decreeing the plaintiff to be the owner of the said stock, and that she recover from Steinfeld the amount of the dividend, less the amount of the purchase price paid by Steinfeld. From the judgment, an appeal was taken to the territorial supreme court. At its March term, 1909, the territorial supreme court·reversed the decision of the trial court and remanded the case, with directions that judgment be entered for defendants. 12 Ariz. 381, 100 Pac. 1094. From this decision the plaintiff appealed to the supreme court of the United States, and that court, at its May term, 1912, refused to consider the case on its merits, because the supreme court of the territory had failed to find the facts in the nature of a special verdict, as required by law, and did for that reason reverse the territorial supreme court's decision and remand the case to the state supreme court, indicating the action we should take by the following language: ''Considering the whole situation, we think we must treat the case upon the theory that the court below committed reversible error in refusing to perform the duty imposed upon it by law, and the reversal of its decree because of such error will have the legal effect of causing the case to be as though it were yet pending undetermined on the appeal from the trial court.'' 224 U. S. 534, 540, 56 L. Ed. 872, 32 Sup. Ct. Rep. 609, 612.

The court finds the facts in the nature of a special verdict as follows:

1. That the plaintiff, Mary Nielsen, is the widow of the late Carl S. Nielsen, who died intestate on or about the fifth day of March, 1901, in Pima county, Arizona territory, leaving as his sole heirs at law his said widow, Mary Nielsen, and their four children, Hilda S., Guynne E., Ian W., and Richard H. Nielsen, then aged thirteen, eleven, nine, and seven years, respectively; that on the fifth day of June, 1903, the probate court of said Pima county granted letters of administration on the estate of the said Carl S. Nielsen, and said Mary Niel-

sen was by the said court duly and legally appointed administratrix of his estate, and duly qualified as such, and since said fifth day of June, 1903, the said Mary Nielsen has been, and now is, the duly qualified and acting administratrix of the estate of the said Carl S. Nielsen; and that the said Carl S. Nielsen in his lifetime was a citizen and resident of the county of Pima, territory of Arizona.

2. That the defendant Albert Steinfeld is a citizen and resident of the county of Pima, territory of Arizona (now state), and resides in the city of Tucson; that the defendant the Silver Bell Copper Company is a corporation duly organized and existing under the laws of the territory (now state) of Arizona; that said corporation was organized on the fourteenth day of January, 1899, under the name of the Nielsen Mining & Smelting Company; and that, by resolution of the board of directors, made on or about the fourteenth day of January, 1901, its name was changed to the Silver Bell Copper Company, and since that date, and up to the present time, the said corporation has conducted its business under and by the name of the Silver Bell Copper Company.

3. That, about the end of the year 1897, said Carl S. Nielsen leased from Albert Steinfeld, as trustee for Julia Zeckendorf, the then unpatented mining claim, situated in the Silver Bell Mining district of Pima county, Arizona, known and called the Old Boot Mine; that said lease was oral and terminable at will. That under said lease the said Nielsen was to have the privilege of working said mine and extracting and shipping and selling ores therefrom on the payment to said Steinfeld as such trustee of a royalty of $1.25 per ton on all ore extracted and shipped or smelted by him, and the said Nielsen was to do the annual assessment work on said claims. That soon thereafter said Nielsen took charge of said mine and proceeded to work the same under said lease and extracted therefrom and smelted at the smelter erected thereat and shipped large quantities of ores, and, during the time the said Nielsen was so operating, he obtained his supplies from Wheeler & Perry, who were engaged in the mercantile business in the city of Tucson, Arizona, and shipped the product of such mine through the bank. While Nielsen was so engaged in conducting his said business, one Hugo J. Donau, who was in the employ of L. Zeckendorf & Co., a firm composed of

L. Zeckendorf and Albert Steinfeld, on behalf of said firm, proposed to said Nielsen that then and thereafter the products of said mine be shipped through the firm of L. Zeckendorf & Co., who would make advances and furnish supplies to be used in the working of said mines; the same to be paid for out of the product of said mine. Said proposition was agreed to and accepted by said Nielsen, and then and thereafter all the product of said mines was so shipped and certain supplies were furnished him by said Zeckendorf & Co., and the proceeds of said product were collected by said firm and applied thereon. This agreement was not by its terms to exist for any specific time.

That at the time the said Donau made said proposition he was in the employ of and acting on behalf of said firm, and at such time said Albert Steinfeld was the managing partner of said firm and in charge of its affairs. That the prospect of said mine grew better as said Nielsen continued to work the same under said lease. That during the time said Nielsen operated said mine under said lease, and prior to the organization of the Nielsen Mining & Smelting Company, he developed large quantities of ore in said Old Boot Mine and erected and used a smelter for the treatment of the ores therefrom, and expended large sums of money in developing said mine and in the erection of said smelter. That on the fourteenth day of January, 1899, the said Nielsen was indebted to the following persons in the following sums, to wit:

| | | |
|---|---:|---:|
| L. Zeckendorf & Co. | $16,608 | 27 |
| L. Zeckendorf & Co. | 826 | 25 |
| Wheeler & Perry | 2,027 | 27 |
| C. T. Etchels | 110 | 00 |
| C. F. Schumacher | 160 | 00 |
| W. J. Corbett | 75 | 00 |
| Gardiner, Worthen & Goss | 438 | 85 |
| J. Dobson | 20 | 00 |
| Employees | 1,221 | 12 |

Total ..............................$21,486 76

—and the said Nielsen had on hand at the mine property, and had in transit to market products of said mine and smelter, which were valued by the said Nielsen and the said Curtis, representing the firm of L. Zeckendorf & Co., and the

said Steinfeld, at a sum slightly in excess of the debts owing. by the said Nielsen, including all debts due by him to the said firm of L. Zeckendorf & Co.

4. That, while the said Nielsen was operating said mine under said lease, the said Albert Steinfeld procured J. N. Curtis to go out and examine the said mine, and after such examination the said Curtis proposed to the said Nielsen to organize a corporation to take charge of and operate said mine and smelter belonging to said Nielsen. That, as a result of said proposal and the negotiations which followed it, the Nielsen Mining & Smelting Company was, on the fourteenth day of January, 1899, duly organized under the laws of the territory of Arizona. That the capital stock of said company was $25,000, divided into 1,000 shares of the par value of $25 each, which said stock was fully paid up and nonassessable. That the incorporators of said corporation were J. N. Curtis, R. K. Shelton, and C. S. Nielsen, and that, upon the organization of said company, the said J. N. Curtis, R. K. Shelton, and C. S. Nielsen became directors thereof, and the said J. N. Curtis was elected president and treasurer of said company, the said R. K. Shelton was elected secretary of said company, and the said Nielsen was elected vice-president of the said company. That at the first meeting of the board of directors of said Nielsen Mining & Smelting Company, held January 14, 1899, the said Nielsen made a proposition to the company to sell to it his smelting plant on or near the Mammoth Millsite, or Old Boot Mine, all the machinery, tools and appliances and personal property owned and used by him in connection with said smelting plant, and also all leases and licenses to work said mines and mining claims in the Silver Bell Mining district which he then had, in consideration of the corporation issuing to him 997 shares of its capital stock, full paid and nonassessable, and also upon the company assuming and paying an indebtedness to various persons, a list of which he presented and which is the list set out in finding 3, which said indebtedness was secured by copper bullion in transit to market through the firm of L. Zeckendorf & Co., and in which he agreed to assign to the company his equity. That the said proposition was duly accepted by the corporation, and the said Nielsen duly transferred to the corporation the property mentioned in his offer,

and received a certificate to the effect that he was entitled to receive therefor 997 shares of the capital stock of said corporation. That the president reported a list of debts assumed by the corporation, which said list is set out in finding 3, amounting to $21,486.76, and reported that the said sum of the indebtedness was secured by large shipments of copper bullion in transit. That by motion duly made the board of directors of said corporation agreed to accept the report of the president concerning said proposal by the said Nielsen, and its acceptance by the president and his actions in the premises were ratified and confirmed. It was also resolved by the board of directors that the corporation take immediate charge and control of the smelting plant and property purchased, and that it continue the mining operations thereat. On motion it was unanimously agreed that Carl S. Nielsen be elected superintendent and act as such for a period of one year, and Mr. Nielsen accepted the position.

5. That, after the organization of said company, it was agreed that the stock of said corporation should be issued as follows: 500 shares to L. Zeckendorf & Co., a partnership composed of Albert Steinfeld and Louis Zeckendorf, and a certificate of 499 shares was issued to said L. Zeckendorf & Co., and 1 share was issued to said Shelton; 170 shares to J. N. Curtis; 30 shares to Albert Steinfeld, as trustee for Julia Zeckendorf; 300 shares to Carl S. Nielsen—and certificates of stock were duly issued to the parties named above for the amounts above stated. That, immediately after the said Nielsen was elected superintendent, he took charge of the property of the corporation, and, subject to the control of the said Curtis, who as president of said corporation had general control thereof, conducted the mining and smelting operations of the company for about one year, and during the time he so operated said mine large quantities of valuable ores were extracted therefrom, smelted and the product thereof shipped to market through the firm of L. Zeckendorf & Co., of which the said Steinfeld was the managing partner, and other bodies of ore developed. That after the organization of said corporation all the products of the mine and smelter were turned over to L. Zeckendorf & Co., and all moneys, goods and supplies were obtained from the said firm of L. Zeckendorf & Co. That during this time Albert Steinfeld was the

active and managing partner of L. Zeckendorf & Co., and as such had absolute control over the credit extended by said firm to the Nielsen Mining & Smelting Company, and as a member of said firm he managed, controlled and voted the stock owned by said firm in said corporation, and by means of the stock owned by said firm, and the stock held by him as trustee for Julia Zeckendorf, he controlled a majority of the stock of said Nielsen Mining & Smelting Company, and, though neither an officer nor director of said company, he dominated and controlled the same.

The share of stock standing in the name of R. K. Shelton belonged to and was the property of L. Zeckendorf & Co., and the said Shelton was but the representative of that firm upon the board of directors of said corporation, and was dominated and controlled by the said Albert Steinfeld. J. N. Curtis was the employee of the said firm of L. Zeckendorf & Co., and, because of the business relations existing between the said Steinfeld and the said Curtis, the said Curtis was largely influenced in his actions as a director of said corporation by the said Steinfeld. That the power of the said Albert Steinfeld over the Nielsen Mining & Smelting Company, and over the directors and officers thereof up to the purchase of the stock of C. S. Nielsen therein on June 29, 1900, arose out of, and was because of, the fact that the said company was largely in debt to L. Zeckendorf & Co., and that L. Zeckendorf & Co., and the said Steinfeld, as trustee for William and Julia Zeckendorf, held a majority of the said stock of said company, and said Steinfeld, as the manager of said firm of L. Zeckendorf & Co., having the power to control said indebtedness and to vote the stock of said L. Zeckendorf & Co., and, as trustee for William and Julia Zeckendorf, having the power to vote their stock, and because of the fact that the said J. N. Curtis and R. K. Shelton were employees of the firm of L. Zeckendorf & Co., and under the direction and control of said Steinfeld, and because of the fact that the said Nielsen had all of his means tied up in the said company and was without means to secure the necessary supplies and advances to operate said mine and smelter, and because all of the product of said mine and smelter was turned over to the firm of L. Zeckendorf & Co., who determined the disposition thereof, and which firm collected all the

proceeds thereof. And that the said Albert Steinfeld, as managing partner of L. Zeckendorf & Co., had the power to determine whether at any time further credit should be extended to said company, and had the power and legal right at any time to cease extending credit to the said company. That the said firm of L. Zeckendorf & Co. was under no obligation at any time to extend any further credit to the said corporation, and had the legal right at any time to cease giving further credit and to enforce the collection of the amount owing to said L. Zeckendorf & Co. by said corporation.

6. That during the year 1899 large amounts of money were expended in developing and working said mine and in the purchase and erection of machinery, buildings and other improvements on said mine and smelter, and thereby substantial quantities of valuable ore were discovered and developed therein, and the value of said mine was substantially increased thereby. That, shortly after the organization of said corporation, an option was granted by Albert Steinfeld, as trustee for William and Julia Zeckendorf, to the said company, giving the said company the right to purchase the Old Boot Mine for the sum of $25,000, payable in quarterly payments of $2,500 each, and providing that, in the event of failure to make payment of each such installment at the time it became due, the said option and right thereunder should be forfeited; and that, at the time of the shutting down of said smelter and the discharge of said Nielsen as superintendent, as hereinafter stated, there was still unpaid on said purchase price the sum of $15,000. Said last-mentioned sum was after July 1, 1900, paid by said company, and said mines thereby became the property of said company and was owned by it at the time of the sale thereof to the Imperial Copper Company. That during the months of October, November and December, 1899, and January, 1900, the smelter of the company was in active operation and was producing copper, and the sale of the product of said smelter was being applied on the debt owed by said company to the firm of L. Zeckendorf & Co. But the mine was not being operated at a profit. That in January, 1899, the Nielsen Mining & Smelting Co. was organized, it assumed all of Nielsen's indebtedness, amounting to $21,486.76, and when it ceased operations in February, 1900,

XV Ariz.—28

it was indebted in the sum of $70,000, aside from $15,000 of a balance on the purchase price of the Old Boot Mine.

7. That some time in the year 1899 the said Steinfeld determined to get rid of Nielsen as a stockholder in said company, and on January 3, 1900, the said Steinfeld wrote the following letter to Nielsen:

"'Mr. C. S. Nielsen, Red Rock, Ariz.

"'Dear Sir: In view of the very large indebtedness existing against the company, and the fact that little headway is being made towards its liquidation, I have decided after careful consideration to close down both mine and smelter when the present coke supply is exhausted, which would be about the 15th or 20th inst. You will please make all provision to this end incurring no larger outlay than is absolutely necessary for such articles as wood, ore and other supplies except what would be required for the purposes stated. The present good showing in the mine may place us in a position to sell the property at an advantageous price and this will be my aim to do at the very earliest possible moment. It will also be wise for you to advise George in that no credits be extended to any one beyond what can be collected during the time contemplated, and that every effort be made to collect all outstandings pending to date.         Yours truly,
                    "ALBERT STEINFELD."

That, at the time he wrote said letter, the said Steinfeld had made up his mind to shut down said mine and smelter for the purpose of acquiring the interest of Nielsen in said corporation, and for the purpose of acquiring a certain adjoining group of mines known and hereinafter referred to as the English claims before proceeding with the further development of the Old Boot Mine, and wrote said letter in pursuance of his said purpose. That the said English group of mines adjoined the said Old Boot Mine, and, if acquired for the corporation, would greatly aid in making a profitable sale of the property, all of which was known to said Steinfeld and Nielsen; that at the time the said Steinfeld wrote the said letter dated January 3, 1900, and at the time of the discharge of the said Nielsen as superintendent, as hereinafter found, and at the time Steinfeld acquired the stock held by the said Nielsen, as hereinafter found, the said Steinfeld intended and expected that the said corporation would acquire

the said English group of mines, all of which facts were known by the said Nielsen. That on or about the first day of February, 1900, the said Steinfeld, although he was neither a director nor officer of said company, undertook to discharge said Nielsen from his position as superintendent of said company, and the said Nielsen refused to be discharged by the said Steinfeld. That, at the time said Steinfeld undertook to discharge said Nielsen, he had not been authorized by the board of directors to do so, and had not consulted with said board, and the said board had not in any way authorized any one to discharge the said Nielsen as such superintendent.

That subsequently the directors, Curtis and Shelton, for the purpose of making it appear from the records of the corporation that said Steinfeld had authority to discharge the said Nielsen, caused to be entered upon the corporate minutes of said company, as of the date of February 1, 1900, the following resolution: "On motion duly seconded it was resolved that C. S. Nielsen be and he hereby is discharged as superintendent of this corporation, and his salary as such be discontinued from this date"—whereas in truth and in fact the said resolution was not put upon the minutes and no meeting was held on February 1, 1900, and not until some days thereafter, on or about the tenth day of March, 1900. And that thereafter, on or about the tenth day of March, 1900, the directors of the said corporation, at a meeting at which J. N. Curtis and R. K. Shelton only were present, but of which meeting said Nielsen had notice, passed the following resolution: "On motion duly seconded the action of the board o directors at its meeting held February 1, 1900, in discharging said C. S. Nielsen as its superintendent is ratified, approved and confirmed. On motion it was unanimously resolved that the said C. S. Nielsen be, and he is hereby, discharged as superintendent of the company."

That at the time above last-mentioned resolution of March 10, 1900, was passed, reciting the ratification of the action of the meeting of February 1, 1900, the said Curtis and the said Shelton well knew that no such meeting of the board of directors had been held on February 1, 1900. That on or about the nineteenth day of February, 1900, the said Nielsen, believing he had been regularly discharged as such superintendent by the board of directors, and believing the state-

ments of said Steinfeld in his letter of January 3, 1900, and having all his means invested in said company, and the existing supply of coke then at the smelter being exhausted, and the said Nielsen being powerless to obtain supplies to run said mine and smelter, and all the assets of the said corporation being under the control of the said Steinfeld, did shut down the said mine and smelter and cease to be in possession and control thereof.

8. That in January, 1900, said Steinfeld caused the development work on said mine to be stopped; the smelter, however, was run until some time in February, 1900, at which time all the coke and supplies necessary for the operation of the smelter, and substantially all of the ore which had been developed prior thereto, were exhausted; but if the development work had not been stopped by the said Steinfeld, but. had been continued during the operation of the said smelter, sufficient ore would have been developed to have kept the smelter continuously supplied. That the said Nielsen at the time of the closing down of the smelter knew the condition of the mine. That, at the time said Steinfeld had such mine shut down, he was informed of the value of said Old Boot Mine, and of the value of said adjoining properties thereto, and did not shut down said mine and smelter because of the very large indebtedness existing against said company and the fact that little progress was being made toward its liquidation, or because it was running deeper and deeper in debt to said L. Zeckendorf & Co., or because the ore was exhausted, but shut down the same solely and exclusively for the purpose of getting rid of the said Nielsen as a stockholder in said corporation and to acquire his said stock and for the purpose of acquiring the English group of mines.

9. That after the mine and smelter of the said Nielsen Mining & Smelting Company had been closed down, as aforesaid, the said Steinfeld called upon the said Carl S. Nielsen and proposed to buy his stock in said company, and also all interest which the said Nielsen and one Lewis might have to the mines or mining claims situated in said Silver Bell mining district. That during the negotiations the said Steinfeld stated to the said Nielsen that, if he did not take the offer of the said Steinfeld, he would get nothing for his said stock. That, at the time the said Steinfeld was negotiating with the

said Nielsen, the said Nielsen was in financial distress and
was without means, and this fact was known to the said
Steinfeld at the time.   That such negotiations were had on
or about the twenty-ninth day of June, 1900.   That the said
Nielsen and the said Lewis executed to the said Steinfeld a
quitclaim deed to the Clarence and Identical mining claims
for a recited consideration of $2,000, and on the same day,
and at the time of the execution of the said agreement herein-
after set forth, said Carl S. Nielsen and Mary Nielsen executed
and delivered to the said Steinfeld a bill of sale by the terms
of which they sold, assigned and transferred unto the said
Steinfeld the said 300 shares of stock, and also signed and
executed upon the back of the certificate representing such
stock an assignment and transfer thereof to the said Stein-
feld, and delivered such certificate, with such assignment and
transfer indorsed thereon, to the said Steinfeld, and a con-
tract was signed by Albert Steinfeld, Nielsen Mining & Smelt-
ing Company, by J. N. Curtis, president, Mary Nielsen, and
Carl S. Nielsen, but was never acknowledged by said Steinfeld
or by said Curtis as president on behalf of the Nielsen Mining
& Smelting Company.   The said deed, transfer and contract
were prepared by S. M. Franklin, the attorney of the Nielsen
Mining & Smelting Company, at the instance and upon the
information furnished by the said Steinfeld, and was sent by
Steinfeld to be signed and acknowledged before W. F. Cooper
by Carl S. Nielsen and Mary Nielsen.

That, upon the delivery and execution of said deed, the said
Steinfeld paid to Nielsen and to said Lewis the sum of $2,000
in cash as consideration for said Clarence and Identical min-
ing claims, which was equally divided between said Carl S.
Nielsen and said Lewis, as the joint owners of said Clarence
mine.   That said contract is in words and figures as follows,
to wit:

"This agreement made the 29th day of June, 1900, be-
tween Albert Steinfeld and the Nielsen Mining & Smelting
Company, a corporation, organized and existing under the
laws of the territory of Arizona, parties of the first part, and
Carl S. Nielsen, and Mary Nielsen, his wife, parties of the
second part, witnesseth: That the parties of the first part,
in consideration of the transfer by said Carl S. Nielsen to
Albert Steinfeld of the three hundred shares of the capital

stock of the Nielsen Mining & Smelting Company, and in consideration of the parties of the second part executing their deed of quitclaim and release of their interest in and to certain mining claims as fully appear from certain quitclaim deed executed by the parties of the second said part and one L. B. Lewis, to said Albert Steinfeld, and in further consideration of the sum of one dollar by the said parties of the second part in hand paid to the parties of the first part, receipt whereof is hereby acknowledged, do hereby agree that they will pay unto the parties of the second part the sum of ten thousand dollars, lawful money of the United States, as soon as the Nielsen Mining & Smelting Company will consummate a sale of its mining properties which are situated in the Silver Bell Mining district, Pima county, Arizona, such sum to be paid within thirty days after such sale is completed. Said parties of the first part further agree that in the event that the Nielsen Mining & Smelting Company should commence active operations that then and in that event the net profits which may arise to said company from its said working and shipping and operating shall be applied, first, to the payment of the debts of said company, second, after said debts are paid said net profits up to the amount of ten thousand dollars shall be paid to the party of the second part, and upon full payment of said sum of ten thousand dollars out of said profits the parties of the first part hereto shall be relieved from all obligations to pay said parties of the second part a like sum of ten thousand dollars, or any part thereof, in the event said company consummates or completes a sale of its property as hereinbefore agreed; that is to say, in no event shall said parties of the second part be paid more than the sum of ten thousand dollars.

"In witness whereof the parties have hereunto placed their hands the day and year first above written. In triplicate.

"ALBERT STEINFELD,
"NIELSEN MINING & SMELTING CO.,
"By J. N. CURTIS, President.
"MARY NIELSEN,
"CARL S. NIELSEN.

"Territory of Arizona,

County of Pima—ss.:

"Before me, William F. Cooper, a notary public in and for the county of Pima, territory of Arizona, on this day personally appeared Carl S. Nielsen and Mary Nielsen, wife of said Carl S. Nielsen, known to me to be the persons whose names are subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purpose and consideration therein expressed, and the said Mary Nielsen, wife of said Carl S. Nielsen, having been examined by me privily and apart from her husband, and having the same fully explained to her, she, the said Mary Nielsen, acknowledged said instrument to be her act and deed and declared that she had willingly signed the same for the purpose and consideration therein expressed, and that she did not wish to retract it.

"Given under my hand and seal of office this 29th day of June, A. D. 1900.

"WILLIAM F. COOPER,

"Notary Public.

"My commission expires March 13th, 1901."

That the payment of the $2,000 cash for the Clarence and Identical mining claims and the stock contract were one transaction. That Steinfeld would not purchase the stock without the mines, nor the mines without stock. That the consideration for the mines and stock was $2,000 and the contract of June 29, 1900. That at the time said Steinfeld entered into negotiations for the purchase of the stock of said Nielsens, and the interest of said Nielsen and said Lewis in said mining claims, and at the time he procured the said Nielsen to sign the said deed, and transfer said stock and enter into and sign the contract above set forth, he did not inform the said Nielsen that he had shut down the mine and smelter of said Nielsen Mining & Smelting Company for the purpose of getting rid of the said Nielsen, and for the purpose of acquiring the English claims, and did not inform the said Nielsen that the said Steinfeld had no authority to do so when he attempted to discharge the said Nielsen, and he did not inform the said Nielsen that the entry contained in said minute-book of the company was a false entry purporting to have been made therein as a record of a meeting of the direct-

ors of said company held about the 1st of February, 1900, and did not inform him that no meeting of the directors was held on that day, and that the said minute-book contained a false record of such pretended meeting.

That the said Nielsen, at the time he signed said deeds and executed said contract and made the said transfer of the stock in the Nielsen Mining & Smelting Company, did not know that the said Steinfeld had shut down said mine and smelter for the purpose of getting rid of Nielsen and acquiring his stock and in order to enable the said Steinfeld to acquire the title to the English group, and did not know that the said Steinfeld had no authority from the board of directors to discharge the said Nielsen, or that the record in the minute-book of the company showing his discharge by said board of directors on or about the 1st of February, 1900, was false, and that no such meeting of the board of directors was ever in fact held, but the said Nielsen believed that he had been legally and duly discharged, and that the said Steinfeld had shut down said mine and smelter for the reasons stated in his letter of January 3, 1900, and acted and relied on such belief. That the said contract of June 29, 1900, was not authorized by the board of directors of the Nielsen Mining & Smelting Company, and that said Curtis signed the same on the part of the company without any authority of the board of directors of said company at the instance and request of said Steinfeld. That upon acquiring the said 300 shares of stock, as aforesaid, the said Steinfeld surrendered the certificate standing in the name of Carl S. Nielsen, and there was issued in lieu thereof a certificate for 300 shares in the name of "Albert Steinfeld, trustee," and said shares have since remained and now stand on the books of said corporation in the name of "Albert Steinfeld, trustee." That neither the said Steinfeld nor the said Curtis made any false representations to the said Carl S. Nielsen or Mary Nielsen, or either of them, with reference to the amount of the indebtedness of the Nielsen Mining & Smelting Company to L. Zeckendorf & Co., but said Carl S. Nielsen and Mary Nielsen had at all times the means of ascertaining the amount of the indebtedness of said corporation to L. Zeckendorf & Co., and could with reasonable effort have ascertained the same; and in all the transactions herein set forth neither the said

Carl S. Nielsen nor Mary Nielsen relied on any such representations.

11. That a part of said English group of mines was purchased by the said Steinfeld with his own funds before and the remaining part was purchased by him with his own funds, after he acquired the stock held by said Nielsen, and was in May, 1903, together with the Old Boot Mine, sold for the sum of $515,000, and the entire proceeds of the sale became the property of the Silver Bell Copper Company. That on or about the twentieth day of January, 1904, the board of directors of the Silver Bell Copper Company declared a dividend of $111 per share on the capital stock of said company, and the said Albert Steinfeld received from the said Silver Bell Copper Company the sum of $33,300 as dividends on the 300 shares of stock which he had obtained from the said Carl S. Nielsen, as above set forth; that the said Steinfeld has kept and retained the said sum of $33,300 and claims the same as his own.

That on the twenty-third day of January, 1904, the said Steinfeld paid to the said Mary Nielsen the sum of $10,000, and received from the said Mary Nielsen a receipt therefor, which said receipt is in the words and figures following, to wit:

"Tucson, Arizona, January 23, 1904.

"Received from Albert Steinfeld the sum of ten thousand dollars ($10,000.00) the same being in full of all claims against Albert Steinfeld and the Nielsen Mining & Smelting Company or the Silver Bell Copper Company, or any or either of them, for all claims or demands which Carl S. Nielsen or Mary Nielsen have or had against the said Steinfeld and the said companies or both or any or either of them, of all kinds or character whatsoever; and I do hereby individually and as administratrix of the estate of Carl S. Nielsen, deceased, release the said Albert Steinfeld and the said Silver Bell Copper Company and the said Nielsen Mining & Smelting Company from any and all claim whatsoever which I have in either of such capacities against them or either of them."

"[Signed] MARY NIELSEN.

"MARY NIELSEN, Adm'x of Carl S. Nielsen.

"Witnesses:

"T. L. CULIN.

"JOSEPH SEVERANCE."

That, at the time said Steinfeld so paid said sum of money to the said Mary Nielsen, he did not inform her of the price at which the property of the Silver Bell Copper Company had been sold to the Imperial Copper Company, nor any of the terms of payment or of any details thereof; that he did not inform her, and she did not know, that the said Silver Bell Copper Company had declared a dividend of $111 per share on its capital stock, and did not inform her that he (the said Steinfeld) had received and then had in his possession the sum of $33,300 as dividends on the 300 shares of stock which he had obtained from the said Carl S. Nielsen, as aforesaid. That at the time of the execution of the contract for the payment of $2,000 for the Clarence and Identical mining claims, and the further payment of $10,000 for the Nielsen stock, under the terms and conditions provided in said contract, neither the mines nor the stock had any market or other value except a speculative value, and that said contract was a fair consideration for said mines and stock at the time of its execution; but at the time the said Steinfeld paid the said sum of $10,000 to the said Mary Nielsen, as the executrix of the estate of her husband, C. N. Nielsen, and by virtue of the sale of the mines by Steinfeld and the corporation and the changed conditions occasioned thereby, the value of said shares of stock had greatly increased, and said Steinfeld at said time knew, when he paid the said sum of $10,000, that it was not a fair value of said stock, but was an inadequate price therefor and much less than the said stock was worth.

12. That said Carl S. Nielsen died on the sixth day of March, 1901, and without having learned of the facts hereinbefore found as to the reasons, or any of them, for said Steinfeld's causing the said smelter and mine to shut down, which impelled the said Steinfeld to cause said smelter and mines to be shut down, and without knowledge of the reasons which influenced the said Steinfeld in acquiring the said 300 shares of stock, but that Nielsen did know all the time that Steinfeld intended to acquire the English group of mines and had before June 29, 1900, purchased the interests of some of the English claimants.

13. That, at the time the said Mary Nielsen received the said sum of $10,000 and executed and delivered said receipt

and release, she did not know that said Steinfeld had resolved to shut down said mine and smelter for the purpose of getting rid of the Nielsens and acquiring the stock of the said Nielsen, and did not know that the said Nielsen had not been discharged by the board of directors on or about February 1, 1900, and did not know that a false statement had been caused to be entered in the minute-book showing a meeting of the board of directors and the passage of a resolution discharging the said Nielsen as superintendent, and did not know the amount of the proceeds of the sale of the property which had been received by the Silver Bell Copper Company, and did not know that any dividend had been declared on said stock, and did not know that the said Steinfeld, at the time he paid her said sum, had received the sum of $33,300 as dividends on said stock, and the said Steinfeld knew all of these things and did not disclose them to the said Mary Nielsen; and that the said Mary Nielsen was ignorant of the facts above set out, and received the said sum of money and executed and delivered the said receipt and release believing that the agreement of June 29, 1900, was a valid and binding contract, and that she and the estate of said Carl S. Nielsen were bound thereby, and the said plaintiff did not discover what the truth in relation to said matters set out in this finding was until within less than one year before the bringing of this action.

Mr. Eugene S. Ives, Mr. S. L. Pattee and Mr. S. V. McClure, for Appellants.

Mr. Geo. W. Lewis, Mr. Wm. H. Sawtelle, Mr. Francis M. Hartman and Mr. Edwin F. Jones, for Appellee.

ROSS, J.—The appellant Steinfeld, although not an officer or director of the Nielsen Mining & Smelting Company, also known as the Silver Bell Copper Company, dominated the company and dictated its business policy. His controlling and dominating influence and power over the business affairs of the mining company arose out of the fact that L. Zeckendorf & Co., of which he was the managing partner, and he owned and controlled a majority of the company's stock and were represented on the board of directors by two of L. Zecken-

dorf & Co.'s employees, who were a majority of the board,
and the further fact that the mining company was largely
indebted to L. Zeckendorf & Co. for moneys and merchandise
furnished it and to be furnished it in the progress of devel-
opment and operation. For these reasons Steinfeld's dom-
ination of the mining company was absolute. His will in the
business affairs and the policies of the mining company was
felt and followed. By refusing credit, he could stop opera-
tions. By legal proceedings to collect what was owing L.
Zeckendorf & Co., he could take from the mining company
most, if not all, of its assets, and by the exercise of his power
over the board of directors he was regnant in its internal
affairs.

Possessing such unlimited power over the mining company,
he ought to be held to owe the same standard of conduct
toward the stockholders of the company as is due from an
officer or director. The general rule is that an officer or
director may purchase the stock of his company from stock-
holders with the same freedom as a stranger, and, in so doing,
the fact that he may be possessed of inside information as
to the future plans and policies of his company is not per-
mitted to militate against him, "and, so long as he remains
silent and does not actively mislead the person with whom
he deals, the transaction cannot be set aside for fraud."
Cook on Corporations, 5th ed., sec. 320, p. 707; *Crowell* v.
*Jackson*, 53 N. J. L. 656, 23 Atl. 426; *Rothschild* v. *Memphis
& Charleston R. R. Co.*, 113 Fed. 476, 51 C. C. A. 310; *Gillet*
v. *Bowen* (C. C.), 23 Fed. 626; *Walsh* v. *Goulden*, 130 Mich.
531, 90 N. W. 406; *Board of Commrs.* v. *Reynolds,* 44 Ind.
509, 15 Am. Rep. 245; *Haarstick* v. *Fox*, 9 Utah, 110, 33 Pac.
251; *Deaderick* v. *Wilson*, 67 Tenn. (8 Baxt.) 108; 2 Story's
Eq., sec. 1564; 4 Thompson on Corporations, 2d ed., sec. 4031.
This rule has been applied by the courts and text-writers
where the bare relation of the officer of the corporation and
the stockholder was involved. But "if it were conceded, for
the purpose of the argument, that the ordinary relations be-
tween directors and shareholders in a business corporation are
not of such a fiduciary nature as to make it the duty of a
director to disclose to a shareholder the general knowledge
which he may possess regarding the value of the shares of
the company before he purchases any from a shareholder,

yet there are cases where, by reason of the special facts, such
duty exists. The supreme courts of Kansas and of Georgia
have held the relationship existed in the cases before those
courts because of the special facts which took them out of
the general rule, and that under these facts the director could
not purchase from the shareholder his shares without inform-
ing him of the facts which affected their value. *Stewart* v.
*Harris,* 69 Kan. 498, 77 Pac. 277 [105 Am. St. Rep. 178, 2
Ann. Cas. 873, 66 L. R. A. 261] ; *Oliver* v. *Oliver,* 118 Ga.
362, 45 S. E. 232. The case before us is of the same general
character." *Strong* v. *Repide,* 213 U. S. 419, 431, 53 L. Ed.
853, 29 Sup. Ct. Rep. 521, 525.

"The special facts" referred to that took the Strong-
Repide case out of the general rule, succinctly stated, were:
That Repide was a majority stockholder and director of a
corporation owning some friar lands in the Philippine Islands.
"He was not only a director, but he owned three-fourths of the
shares of its stock, and was, at the time of the purchase of
the stock, administrator general of the company, with large
powers, and engaged in the negotiations which finally led
to the sale of the company's lands (together with all the
other friar lands) to the government at a price which very
greatly enhanced the value of the stock. He was the chief
negotiator for the sale of the lands and was acting substan-
tially as the agent of the shareholders of this company by
reason of his ownership of the shares of stock in the corpora-
tion and by the acquiescence of all the other shareholders,
and the negotiations were for the sale of the whole of the
property of the company. By reason of such ownership and
agency, and his participation as such owner and agent in the
negotiations then going on, no one knew as well as he the
exact condition of such negotiations. No one knew as well as
he the probability of the sale of the lands to the government.
No one knew as well as he the probable price that might be
obtained on such sale." At the time Repide bought the
Strong stock negotiations for the sale of the company's lands
were pending, and these negotiations were entirely in his
hands, and a failure on his part to disclose these facts, the
court held, amounted to fraud and deceit. We would be
bound by that case if the facts in this case were the same.
In that case Strong was not an officer of the company and

had no part in its management, and the sale to the government was entirely in Repide's charge and pending at the time he bought the Strong shares. Nielsen was not only a stockholder in the Nielsen Mining & Smelting Company, but was also a director. He was also the superintendent of the mines and smelter. In his official capacity he had a most intimate knowledge of the value of the mines and of the operation and production of the smelter. He knew, or should have known, the indebtedness of his company. He knew at the time of the shut-down that Steinfeld had already purchased the interest of some of the English claimants in the adjoining mining claims, and that he intended acquiring the title to all of the English group of claims. He was in possession of all of these facts on June 29, 1900, the date he entered into the contract with Steinfeld, selling his stock.

The property of the company was sold through the efforts of Steinfeld on May 20, 1903, to the Imperial Copper Company; no sale to this company nor anyone else was pending at the time Steinfeld bought the Nielsen stock, nor at the time of the shut-down. Nielsen knew that Steinfeld had been trying to sell, and that it was his purpose to sell if a purchaser could be found. Steinfeld's letter of January 3, 1900, and the contract of sale to Steinfeld apprised Nielsen of Steinfeld's purpose to sell. Under these circumstances, there were no "special facts" known to Steinfeld that were not also known to Nielsen.

The operation of the mines and smelter was suspended by Steinfeld confessedly for two reasons: (1) To acquire title to the English group of mining claims, of which purpose Nielsen had knowledge; and (2) to acquire the Nielsen stock and thereby dispense with his services as superintendent of the mines. At the time of the shut-down, all of Nielsen's means consisted of his interest in this corporation. The corporation was heavily in debt, owing about $70,000. The debt, at the date of the organization of the Nielsen Mining & Smelting Company, was less than $23,000. Part of the increased indebtedness is accounted for in improvements on the mines and smelter and the payment of $10,000 on the optional contract of purchase of the Old Boot Mine.

In view of all these circumstances, or in any case, can it be said that Steinfeld was guilty of fraud or coercion, as

alleged in the complaint, in suspending the work at the mine for the purpose of acquiring the Nielsen stock and getting rid of the Nielsens, for the evidence shows that, if there was fraud or coercion, it consisted in that one act, emphasized by the statement of Steinfeld to Nielsen that, if he did not take the offer of Steinfeld, he would get nothing for his stock. This last statement, construed under the condition in which it was made, was not necessarily a threat, for it was a fact that the corporation was largely indebted and liable to be sued and its assets taken by creditors; and it was without means to meet the payments on its optional contract to purchase the mines, and a failure to make such payments subjected its principal asset—the mines—to be forfeited as well, also, as all previous payments. The embarrassing and precarious situation of financial inability to meet obligations due and coming due was not the creation of Steinfeld. It arose from an effort on the part of the corporation to acquire, develop and operate the mines—the very object of its creation. Steinfeld, through Zeckendorf & Co. by suit, could have taken the mines for the debt owing the latter without violating any duty he owed Nielsen, or he had it in his power to carry the Zeckendorf account, pay the installments on the purchase price of the mines, purchase the English group of mines, and negotiate a sale of the consolidated property, leaving the Nielsen stock as Nielsen's, entitled to dividends on the whole selling price.

This the appellee claims was his duty. We do not believe that his duty to Nielsen required that he should use his personal credit and financial standing to augment the mining company's resources or to pay its debts or to extend its credit.

The facts in *Perry* v. *Pearson et al.*, 135 Ill. 218, 235, 25 N. E. 636, 641, are in many respects similar to the facts of this case, and we quote from it language which we think applies here with especial force: "It is claimed that appellees made statements to Perry himself which had the effect of discouraging him and exciting his fears as to the future of the company. It was impossible for them to tell him anything about the company or its affairs or its prospects, which he did not know. The pecuniary liabilities of the company pressed as heavily upon them as upon him. If, when they stated the truth to him, he became depressed thereby, we can-

not see that they are to blame. It is urged, however, that, by reason of the fact that Perry and the Pearsons were co-stockholders and codirectors in the company, there were confidential relations between them, such as exist between a trustee and *cestui que trust,* and that therefore appellant, as the *cestui que trust,* has the option to set the sale aside independently of the question whether it was fraudulent in fact or not. It is true that, in a certain sense, the directors of a corporation occupy the position of trustees toward the stockholders. As the value of the shares of the stockholders and their rights in connection therewith are affected by the conduct of the directors, a trust relation is created between them. The directors owe a fiduciary duty toward the stockholders in dealings which may affect the stock. 3 Pomeroy's Equity Jurisprudence, sec. 1090. It would certainly be most inequitable to permit the directors of a corporation to so manage its business, or to so deal with its property, as to lessen the value of its stock for the purpose of purchasing such stock for themselves at a low figure. But in the present case the appellant was more than an ordinary stockholder; he was not only the owner of a majority of the stock, but was himself a director and the president of the corporation, intrusted with the control and direction of its business.''

It is complained that the price paid by Steinfeld for the Nielsen stock was inequitable and inadequate. Nielsen and Lewis were the owners of two unpatented mining claims located near or adjoining the Old Boot Mine, and Nielsen owned 300 shares of the Nielsen Mining & Smelting Company stock. Steinfeld would not buy the mines unless he could buy the stock; nor would he buy the stock without the mines. While separate instruments were executed evidencing the sale of the mines and the stock, they were in fact but one transaction; and the consideration for the conveyances to Steinfeld was $2,000 cash at the date of sale, and the agreement to pay Nielsen $10,000 additional if realized from the net operations of the mine or upon a sale of the company's property. The pecuniary liabilities of the company were heavy; the Old Boot Mine, its principal resource, was held under an optional sale and liable to be forfeited for failure to make its payments of installments on the purchase price when due; and the company was without money or credit.

The trial court refused to find the value of the Nielsen stock at the time work was suspended at the mine or at the time that Steinfeld bought it. There was no proof in the case whatever showing that the stock had any value other than a speculative value. No dividends had been paid, and the company owed more when it ceased operations than when it began. After the operations were closed down in February, 1900, not a furnace was fired or a pound of ore produced. Steinfeld evidently concluded that the property would realize more from a sale than from operation, which is not infrequently the case. What might be realized in a sale of the property was, of course, problematical.

Steinfeld offered $2,000 cash and the above agreement, and, in view of the involved financial condition of the company, we cannot say that he was paying too little for what he got. Again we quote from *Perry* v. *Pearson et al., supra* (135 Ill. at pages 230, 228, 25 N. E. at pages 639, 638):

"But let it be admitted that appellant's stock was sold for much less than it was worth. He made the sale with his eyes open. He seemed to be willing to part with his stock at a low figure rather than run the risk of being held liable for the debts of the company. No misrepresentations were made to him. He was well acquainted with the value of what he was selling, as were those who purchased from him. Whenever it appears that the parties knowingly and deliberately fixed upon any price, however great or however small, there is no occasion nor any reason for interference by courts, for owners have a right to sell property for what they please, and buyers have a right to pay what they please. 2 Pomeroy's Equity Jurisprudence, sec. 927, note 'e,' and cases cited."

"Mere inadequacy of price, unaccompanied by other inequitable incidents, will not justify a court of equity in setting aside a sale or contract. The cancellation will only be decreed where the inadequacy of price is so gross that it shocks the conscience and furnishes satisfactory and decisive evidence of fraud. 2 Pomeroy's Equity Jurisprudence, secs. 927 and 928." *Graffam* v. *Burgess*, 117 U. S. 180, 29 L. Ed. 839, 6 Sup. Ct. Rep. 686; 9 Cyc. 367.

At the time that Steinfeld purchased the Nielsen stock, the assets of the Nielsen Mining & Smelting Company consisted of the Old Boot Mine and the machinery and equipment

thereon. Subsequently Steinfeld, with his own means, purchased the English group of claims and in May, 1903, nearly three years after he had bought the Nielsen stock, sold the consolidated groups to the Imperial Copper Company for $515,000. Doubtless the added mining claims had the effect of increasing the value of the Nielsen stock. However, the amount received for a much enlarged property, sold some three years after and when the situation was materially changed, is no test or measure of the value of the Nielsen stock in June, 1900. If Steinfeld's venture and risk had proved a failure, the loss would not have been suffered by Nielsen. The venture or speculation having been successfully floated by Steinfeld's energy and at his risk, we think he is entitled to the fruits of his labor. It may be a fact that the Nielsens executed the contract to Steinfeld largely because of their straitened circumstances. This is not an anomalous condition of contracting parties. Indeed, in a large proportion of the transactions involving transfers of title in property, one of the parties is acting from pecuniary necessity. If the Nielsens were poor and hard pressed in money matters, it is not shown that Steinfeld contributed to it or that he was responsible for it. They yielded to the pressure of their situation and freely and voluntarily signed the contract of sale. "Such an act as that of signing those instruments, under the circumstances disclosed in the record, must be regarded, both in equity and at law, as a voluntary act, as it was unattended by any act of violence or threat of any kind calculated in any degree to intimidate the party or to force the result, or to compel that consent which is the essence of every valid contract." *French* v. *Shoemaker,* 14 Wall. 315, 20 L. Ed. 852.

The discharge of Nielsen as superintendent, whether by the mining company or by Steinfeld, is not shown to have been violative of any rights of Nielsen. Nor is it evident that by reason thereof he was in the least influenced to execute the contract of sale with Steinfeld. Nor is it shown that his financial distress was more acute by reason of his discharge. Had the operations at the mine shown dividends or increase of value in the company's assets, or had the company been able within itself to carry on development and operations, the appellee's complaint that Nielsen was discharged as superintendent for the purpose of acquiring his stock might be

justified and form the basis for equitable relief, especially if its effect was injurious to Nielsen. But, under the circumstances as they existed, no injury is shown. The fact that Steinfeld entertained the secret purpose of acquiring the Nielsen stock and thought that Nielsen's discharge might facilitate his purpose could not have influenced Nielsen's subsequent conduct in executing the contract of sale to Steinfeld. Undisclosed purposes and intentions as to future conduct or action of Steinfeld were not matters that Nielsen was entitled to know. The facts, as they existed at the time of the transactions, were within Nielsen's knowledge. He was fully advised, and if he made a poor bargain, of which we are not convinced in view of all the circumstances at the time, he cannot now complain.

We think the trial court committed error in decreeing a rescission of the contract of June 29, 1900, and giving judgment in favor of the plaintiff for the 300 shares of stock, together with dividends thereon.

That judgment is reversed and the cause is remanded, with directions that judgment be entered for the defendant.

FRANKLIN, C. J.—I concur. In the decision of this case it is important, as affecting the fiduciary relationship of the parties, to bear in mind the subject matter and character of the action. Its basis is a contract for the purchase of certain shares of stock in a corporation and an interest in certain mining claims. The contract was entered into by two stockholders of a corporation. At the time of the contract, Steinfeld was and had been a stockholder and a dominating influence in the affairs of the corporation. Nielsen was a stockholder and director, and had been, until a short time previous, very active in the conduct of the business of the corporation. The action is for rescission or undoing of the contract for the purchase of the stock. The action does not involve directly the conduct of either party with reference to the conduct of the business of the corporation, or the acquisition by either of them of any of the property of the corporation; in other words, it does not involve the relation of directors or officers of a corporation and the corporation itself and the stockholders; cases where such directors are, by virtue of a position of trust and confidence, prohibited from making contracts with themselves individually, from purchasing property

from themselves, or selling to themselves, or from making a personal profit out of their dealings with the corporate affairs and the like. Nor is it a case where a director or managing officer of a corporation, by virtue of fraudulent misrepresentations or concealments concerning the company's affairs, induces a person to purchase shares of the stock or enter into a contract for their purchase, and thereby sustain a loss. Neither does it involve the specific performance of a contract which, upon a review of the facts and the situation and condition of the parties, a court of equity in its discretion might refuse to lend its aid in the enforcement thereof. For a court of equity will very often refuse to decree specific performance under a state of facts, where, in a case under the same state of facts, it will refuse to order a rescission. This action is for the rescission of a contract fully performed, and in which contract the parties alone are concerned. The executrix of one of the parties, deceased, comes into a court of equity asking that the contract between Steinfeld and the deceased be set aside on the ground of fraud. The stress of the argument advanced is inadequacy of consideration. A court of equity looks upon inadequacy of consideration only as a mark of fraud or imposition, except, for instance, there be such inadequacy of price as that it must be impossible to state it to a man of common sense without an exclamation at its inequality. Only in such a case does a court of equity consider that a sufficient proof of fraud to set aside a conveyance. *Gwynne* v. *Heaton*, 1 Bro. Ch. 9.

The appellee dwells with emphasis upon the value of the stock and the conditions at the time the purchase price therefor was paid and the transfer made. But I think it infinitely more important to a just view of the matter to consider the situation of the parties and the value of the stock at the time the contract for its purchase was made. When we take into consideration the situation of the parties, the condition of the property of the corporation, and the value of the Nielsen stock at the time of the contract for its purchase, and the relative capacities of Steinfeld and Nielsen to render the stock of any value, I cannot escape the conviction that, at the time of making the contract, Steinfeld offered a very fair price indeed for the stock. From a fair consideration of the evidence, I am unable but to conclude that the only means

whereby the stock would become of any value was by a sale of the mines of the corporation consolidated with the adjoining mines acquired by Steinfeld with his own funds. The evidence discloses that the sale thereof, negotiated by Steinfeld some years afterward, was the means which gave value to the stock.

Steinfeld was sharp, shrewd and alert, if you please. After purchasing the Nielsen stock he was on the lookout for a profitable deal. By his business ability and financial standing and connections, he was enabled to and did make a sale of the consolidated property at a handsome figure. By making the sale, the burdens of the corporation were lifted, and from straitened circumstances it emerged opulent and its stock thereby became valuable. This was due to the efforts of Steinfeld, and by his ingenuity, industry and financial ability it was brought about. That the stock was purchased at a low price and subsequently, by the efforts of Steinfeld, it was made very valuable does not seem to me grounds for undoing the purchase of the stock and give all the benefit of the deal to the estate of Nielsen. However much as a matter of sentiment it may be desired to subtract from the rich and give thereof to those less fortunate in the ability to acquire, justice is imperative, and it is the stern duty of the court to close its eyes to sentiment and proclaim and preserve the rights of all under the law with equality, and without consideration of the wealth or poverty of the parties to influence its judgment. For, as Epictetus observed, "If you wish to make your judgments just, regard not any of those who are parties to the suit, nor those who plead in it, but regard justice itself."

Mr. Justice DANIEL in the case of *Eyre* v. *Potter,* 15 How. (U. S.), at page 59, 14 L. Ed. 592, in giving the opinion of the court, said: "The parties, if competent to contract and willing to contract, were the only proper judges of the motive or consideration operating upon them, and it would be productive of the worst consequences if under pretexts, however specious, interests or dispositions subsequently arising could be made to bear upon acts deliberately performed, and which had become the foundation of important rights in others. Mere inadequacy of price, or any other inequality in a bargain, we are told, is not to be understood as constituting *per se* a ground to avoid a bargain in equity, for courts of equity,

as well as courts of law, act upon the ground that every person who is not, from his peculiar condition or circumstances, under disability is entitled to dispose of his property in such manner and upon such terms as he chooses; and whether his bargains are wise and discreet or otherwise, or profitable or unprofitable, are considerations not for courts of justice, but for the party himself to deliberate upon. *Vide* Story's Equity, sec. 244''—and cases cited.

Courts will refuse to order the rescission or undoing of a contract on the ground of fraud unless the proof of the fraud is clear and decisive, and the facts before us do not present such a case. The facts of this case, as a basis for the relief sought in this action, do not bring Steinfeld within the sphere of a fiduciary relation where equity would measure with jealous care his conduct as that of a trustee. Neither does the case present those special or peculiar facts by reason of which equity would regard him as a trustee under a qualification, or, as the books have it, a *quasi* trustee, or a trustee *sub modo*. On consideration of the adjudicated cases, where a person under the special facts in the case is characterized as a *quasi* trustee or trustee *sub modo*, it seems to me a distinction without a difference, more an expression of form than a matter of substance, for such a person, under the special facts, is held to all the duties and obligations which the relation of trustee enjoins. To decree a rescission of the contract, under the facts of this case as we find them, would indeed be extending equity too far, and it is said in the legal maxim that nothing is so unjust as to extend equity too far. *Nihil iniquius quam aequitatem nimis intendere.* It would be regarding the parties to the suit and not the justice of the case.

The true perspective of this case is had by viewing the contract of the parties for the sale and purchase of the stock in the light of the circumstances and conditions which surrounded the making, and not in the light of subsequent developments. Though, in the light of subsequent developments, it must be admitted that appellee made an improvident deal and got a very poor bargain, nevertheless, under the facts presented, it cannot in equity and good conscience be held that appellant should suffer by reason thereof.

CUNNINGHAM, J., Dissenting.—I sincerely regret that I cannot agree with the conclusion reached by the other mem-

bers of this court in this cause. I fully realize that a dissenting opinion establishes no legal principle, but it is a consolation to the dissenter and a medium of expressing his personal views in which he alone is interested—a kind of shady avenue leading to an imaginary goal of personal vanity. With this understanding of my reasons for presenting my views of this cause, I will not endeavor to more than state wherein I principally differ from the other members of the court, with few reasons given in support of my views, I will make no general statement of the facts, but will rest upon the statement of facts in the principal opinion.

The point upon which I differ from the other members of the court arises upon the effect given to the transaction by which the shares of stock were transferred by Nielsen to Steinfeld, and particularly the effect to be given to the instrument bearing date June 29, 1900, by the terms of which Steinfeld and the Nielsen Mining & Smelting Company on its face promised to pay to the Nielsens, upon certain conditions, the sum of $10,000. The majority of the court, treating the entire transaction as an absolute sale of the stock with the other property transferred at that time, gave no effect to the above-mentioned instrument other than a promise to pay a specific sum. I think that instrument should be given the effect of a declaration of trust and treated as such limiting the rights of Steinfeld in the title to the stock acquired by the bill of sale given to him by Nielsen and wife of the same date. The instrument recites the previous transactions as a consideration for its execution, recognizes that the Nielsens have further equities in the stock upon the happening of one of two contingencies, viz., a profitable operation of the corporate properties or a sale of the properties. An equity existed until the happening of one or the other of the conditions. Steinfeld held the stock subject to this equity in the Nielsens. The Nielsens would be benefited by the sale of the corporate properties. Steinfeld held the legal title, with complete control over the shares of stock. In the light of the subsequent sale of the corporate properties, Steinfeld held this stock for the designated purpose of facilitating that sale. The $10,000 was to be paid out of the accumulated profits from operating the properties, if operated at a profit, or out of the proceeds of the sale of the corporate properties. I think no other fair

construction could be placed upon the instrument under consideration. It is clear, then, that by the entire transaction we have a designated beneficiary, the Nielsens; a designated trustee, Steinfeld, who is not the beneficiary; property sufficiently identified to enable title thereto to pass to the trustee; and the actual delivery and legal assignment of that property to the trustee, with the intention of passing legal title thereto to him as trustee. We therefore have a transaction presenting all the elements of an express trust created in the shares of stock. *Brown* v. *Spohr,* 87 App. Div. 522, 84 N. Y. Supp. 995; *Martin* v. *Funk,* 75 N. Y. 134, 31 Am. Rep. 446; *Young* v. *Young,* 80 N. Y. 422, 36 Am. Rep. 634; *Sullivan* v. *Sullivan,* 161 N. Y. 554, 56 N. E. 116; *Matson* v. *Abbey,* 70 Hun (N. Y.), 475, 24 N. Y. Supp. 284.

A trust is an equitable obligation, either express or implied, resting upon a person by reason of a confidence reposed in him to apply or deal with the property for the benefit of some other person or for the benefit of himself and another or others, according to such confidence. *McCreary* v. *Gewinner,* 103 Ga. 528, 29 S. E. 960, 963. As further defined, a trust arises "where there are rights, titles and interests in property distinct from legal ownership. In such cases the legal title, in the eye of the law, carries with it to the holder absolute dominion; but behind it lie beneficial rights and interests in the same property belonging to another. These rights, to the extent to which they exist, are a charge upon the property and constitute an equity which a court of equity will protect and enforce whenever its aid for that purpose is properly invoked." *Seymour* v. *Freer,* 75 U. S. (8 Wall.) 202, 19 L. Ed. 306; *Crosby* v. *Colton,* 5 Tex. Civ. App. 583, 24 S. W. 343.

We find that the trustee received, as apportioned to that stock, $33,300, a sum far in excess of the sum mentioned to be paid by him to the Nielsens on condition of a sale of the property. This sum was not a profit but a division of the assets of the corporation and a diminution of the capital of the corporation which the stock represented. When this sum reached the possession of the trustee, he held it upon the same trusts that he held the stock, of which it was a part of the value. Steinfeld then held the money, together with the stock, as representing the full value of the trust property. To say that he could discharge his trust by paying to the beneficiaries

a part of the money so received by him, and thereby acquire a perfect title to the shares of stock and the balance of the money so acquired, all relieved from the trust, would permit him, as trustee, to gain a personal advantage or profit from his office or position of trustee, which no court of equity will permit. 1 Perry on Trusts, 6th ed., sec. 427.

If it be contended that Steinfeld only declared that he would pay $10,000 of the sum received by him from the proceeds of a sale of the corporate properties, and therefore all the beneficial interest the Nielsens had in the property extended to that sum alone, and that Steinfeld took the beneficial, as well as the legal, interest in such balance, that contention is foreclosed by the general rule, viz.: "If, upon a conveyance, devise or bequest, a trust is declared of part of the estate only, or the purposes of the trust do not exhaust the whole beneficial interest, the trust in the remaining part or interest will result to the settlor or his heirs, for the reason that a declaration of trust as to part is considered sufficient evidence that the settlor did not intend the donee to take the beneficial interest in the whole, and that the creation of the trust was the sole object of the transaction." 1 Perry on Trusts, 6th ed., sec. 152, p. 240; 3 Pomeroy's Equity, 3d ed., sec. 1034; 39 Cyc. 244, 4 cases cited in note 6.

To permit the trustee to require the beneficiary to release him from all demands, under the circumstances disclosed, would amount to permitting him to make a very large profit from his office, which cannot be allowed. 1 Perry on Trusts, 6th ed., sec. 427. The attempted release upon receipt of the $10,000 executed by Mrs. Nielsen has no other effect than a simple receipt for that sum. 2 Parsons on Contracts, 9th ed., 657, and note "u" on page 658.

An examination of the complaint and the prayer for relief will disclose sufficient authority to warrant an affirmance of the judgment upon the theory of a trust relation.

For these reasons I think the judgment of the lower court was proper and in full accord with law and equity.

ON MOTION FOR REHEARING.

(Filed April 16, 1914.)

FRANKLIN, C. J.—One who is familiar with the delightful comedies of Moliére cannot fail to remember his faculty to imbue in great degree farce and burlesque with the true spirit of refined comedy. In one instance he depicts with rare delicacy and humor the situation of two doctors; a Doctor Tant-mieux (so much the better), and a Doctor Tant-pis (so much the worse). Like unto a dialogue between hope on its feet and despair taking to its bed, these doctors were expected never to agree; nay, they never did nor could agree. The theater of this appeal presents a situation curious too, in that the appellant and the appellee cannot agree on anything or in any particular. They differ about the law, about the facts, on the opinion of this court in the instant case, on the language and effect of former decisions of this court, on the jurisdiction of this court, on the procedure governing its deliberations, and the scope and extent of, and the limitations upon, its power to review and pronounce judgment. The cause in its progress toward a final determination of the rights of the parties has had a varied career, and not without its vicissitudes, which have, perhaps, been more common to it than attends ordinarily the passage of litigation. The action was commenced in 1905, and its progress has been delineated in the principal opinion. It is sufficient here to state that the judgment of the trial court, in favor of the appellee, has, on appeal, and on a consideration by the appellate court of the law and the facts, been held both by the supreme court of the territory and the supreme court of this state to be erroneous. A rehearing of the case was asked in the supreme court of the territory and denied. On appeal to the supreme court of the United States, that court, "considering the whole situation," treated the case upon the theory that the territorial supreme court committed reversible error in adopting the findings of fact made by the trial court, and in not certifying to the supreme court of the United States findings of fact proceeding from its own conscience as required by the federal statute.

From the judgment of this court the appellee has asked for a rehearing. The motion for rehearing was filed February 10, 1913, and on August 27, 1913, an amended motion for a rehearing was filed which is inadvertently stated to have been done by leave of this court; but, as no objection has been made by appellant on that score, we shall in this instance consider the amended motion filed by leave granted. Under the rule an amended motion for rehearing may not be filed without leave of the court. The court has indulged counsel on both sides in the filing of many briefs on the one side in support of the motion and on the other side in objection to it; the last brief having been filed January 23, 1914. The briefs present a painstaking essay to spare no point which might affect the decision of the cause, and able and skillful efforts to enlighten the court in every possible way. As we have said, there is an absolute lack of harmony between the parties in every matter and in every particular of the matter. Nothing but a knitting up by the appellee and a raveling out by the appellant, and no progress is or will be discernible whatever unless we are capable of eliciting from the sea of things the fractions which are cardinal. Unless we are capable of doing this, the opinion will become one long drawn out. This task, for the sake of brevity, we must apply ourselves to, and all others omit.

The opinion of the supreme court of the state in this cause was filed on January 27, 1913, and in the amended motion for a rehearing filed by appellee more than six months thereafter a matter is for the first time suggested affecting the jurisdiction of both the territorial supreme court and this court on the appeal. It is asserted that the notice of appeal and the bond on appeal are insufficient to give this court jurisdiction of the appeal.

Paragraph 1493 of the Revised Statutes of Arizona of 1901 provides: An appeal may, in cases where an appeal is allowed, be taken during the term of the court at which the final judgment or order is rendered by appellant giving notice of appeal in open court, which shall be noted on the docket and entered of record, and by filing with the clerk an appeal bond or affidavit in lieu thereof, as hereinbefore provided, during the term or within twenty days after the expiration of the term.

Within the time prescribed by the statute, the appellant

gave notice of appeal in open court, which was entered of record in language as follows: "Come now the defendants herein and except to the ruling of the court in rendering a judgment in favor of the plaintiff and in overruling their motion for a new trial herein, and give notice of appeal to the supreme court of the territory." The bond on appeal describes the judgment and recites an appeal from the judgment, but does not recite an appeal from the order overruling the motion for a new trial. The language of the minute entry indicates beyond the peradventure of a doubt that it was the intention of the appellant to take an appeal from both the judgment and the order overruling the motion for a new trial. The notice recites the judgment and order and excepts to the ruling of the court, and gives notice of appeal to the supreme court of the territory. The ruling excepted to embraced both the judgment and order overruling the motion for a new trial.

Analyzing the notice hypercritically, we think it evident that the notice is a sufficient taking of the appeal from the judgment and the order.

In perfecting such appeal the bond did not recite the order overruling the motion for a new trial, but was limited to the judgment. The appeal is taken by giving the notice; it is perfected by giving the bond. Does the failure of the bond to recite the order overruling the motion for a new trial destroy the jurisdiction of this court on the appeal, or does it merely affect its jurisdiction? In other words, if this court has jurisdiction of the appeal, to what extent may the exercise of that jurisdiction go in its disposal? We must note this with some care, though strive to do it compendiously that reproach may not argue a deficiency of perception as to what the pronouncements of this court have been on this subject.

In the Revised Statutes of 1887, the chapter on appeals and writs of error provided for but one appeal, to wit, an appeal from the judgment; only one writ of error, to wit, from the judgment. Paragraph 846 says: "An appeal or writ of error may be taken to the supreme court from any final judgment of the district court rendered in civil cases." The appellate jurisdiction of the court was limited to final judgments. But on appeal from a final judgment, the exercise of that jurisdiction was prescribed, the scope and power of its review indicated. The supreme court shall have jurisdic-

tion to review upon appeal, or other proceedings provided by law. This is the language of paragraph 593, Revised Statutes of 1887. The statute then proceeds to enumerate the particulars and indicates the extent of the exercise of its jurisdiction or scope of its power of review on appeal from the judgment, which by recital includes the power or jurisdiction to review an order granting or refusing a new trial, sustaining or overruling a demurrer, or affecting a substantial right in an action or proceeding. The appeal must be from the judgment, and no provision is made for direct appeal from the order, but if from the judgment, the power of review is extended to and embraced the order.

Let us carefully note the language used in the revision of 1901. The wording is significant. The first part of paragraph 1493, Revised Statutes of 1901, is identical with paragraph 846, Revised Statutes of 1887. Paragraph 1493, *supra,* reads: ''An appeal or writ of error may be taken to the supreme court from any final judgment of the district court rendered in civil cases, and from any of the orders mentioned in section 1214, which the supreme court has jurisdiction to review.'' The last part of the paragraph just quoted, which was added by the revision of 1901 to the statute of 1887, has a most important bearing in considering what was the purpose and intention of the legislature in thus ingrafting such language on that of the earlier statutory expression. That the language was used advisedly we are persuaded, and that its purpose is clear we are convinced.

Reconnoitering on the statute fields of 1887 and 1901, it does not require a glass to see that there is but one appeal, but one writ of error, contemplated and provided. Under the statutes of 1887 the appeal was from the judgment, and the extent of the court's power to review on such appeal was provided by the statute. Under the statutes of 1901, there is an appeal from the judgment and from any of the orders mentioned in section 1214, which the supreme court has jurisdiction to review. The extent of the review permitted on such appeal is also indicated in the statute; but, unlike the statute of 1887, the statute of 1901 places the extent of our power to review largely within the control of the party appealing. The appeal is from the judgment and from any of the orders mentioned. Not from any of the orders mentioned without

an appeal from the judgment, but from the judgment and any of the orders are the words of the law. The appeal may be taken directly from the judgment and any of the orders, but it may not be taken directly from any of the orders mentioned independently of the judgment. In other words, there is given the right of direct appeal from the final judgment and any of the orders mentioned, but not the right of direct appeal separately and apart and independent of an appeal from the judgment. The views expressed are emphasized by a scrutiny of the method prescribed for taking and perfecting the appeal under each of the statutes noticed. They are alike as two peas, the method when the appeal was from the final judgment only, and the method when the appeal was taken from the final judgment and any of the orders mentioned. The notice of appeal is the same, the cost bond is the same, the stay bond is the same. No change made in taking and perfecting either the appeal or the writ of error. The important change, however, is that the revision of 1901 placed it largely within the control of the party appealing to fix the scope of the appeal; that is to say, the extent to which the court in a given case may exercise its jurisdiction to review. By taking and perfecting the appeal from the judgment only, our right of review was restricted to the judgment-roll and any intermediate order involving the merits and, necessarily, affecting the judgment. The appeal from the judgment only did not destroy the jurisdiction of this court, but only limited the exercise of its jurisdiction by confining the scope of its right of review. If the appeal was taken and perfected from the judgment and from the order overruling the motion for a new trial, the right of review to that extent was thereby enlarged, and so on as the appeal from the judgment would embrace any other appealable order. In fine, the appellant could restrict us to a review of the judgment-roll, and the intermediate orders, and he could also enlarge the right of review as he extended the scope of his appeal to embrace not only the final judgment, but any other appealable order that the issues on his appeal might require to be reviewed. In no case has this court even hinted that the failure to appeal from the judgment and order denying the motion for a new trial destroyed the jurisdiction if the appeal was taken and perfected from the judgment only. In each of the following

cases the appeal was taken and perfected from the judgment only: *Arizona Eastern R. Co.* v. *Globe Hardware Co.*, 14 Ariz. 397, 129 Pac. 1104; *Miami Copper Co.* v. *Strohl*, 14 Ariz. 410, 130 Pac. 605; *Van Dyke* v. *Cordova Copper Co.*, 14 Ariz. 499, 132 Pac. 94; *Thomas* v. *Bartleson*, 14 Ariz. 513, 131 Pac. 973. In these cases we held that the court had jurisdiction of the appeal, but that the exercise of that jurisdiction was restricted in the scope or extent of our power to review. Under the Revised Statutes of 1901, we have never taken jurisdiction of an appeal from an order independent of an appeal from the judgment, and we have never held that an appeal from the judgment only was fatal to the appeal. What is the situation of the instant case? The appellant gave notice of appeal from the judgment and from the order denying the motion for a new trial. The appeal was perfected, however, by giving a bond reciting an appeal from the judgment. Under the Laws of 1901, as construed by this court in the cases *supra*, the appellant by his method of perfecting the appeal restricted our right of review to the judgment-roll and such intermediate orders as involved the merits and necessarily affected the judgment.

But a change has come over the appellate procedure. Probably at the suggestion of this court in the case of *Miami Copper Co.* v. *Strohl, supra*, the legislative authority has yielded to the advice of this tribunal and has attempted a phrasing of the appellate procedure that will do away with the apparent technicalities that beset us in that case and limited the right of review on the record as there presented.

On October 1, 1913, Senate Bill No. 108, entitled "An act to provide for the review of judgments and orders of superior courts of the state of Arizona, and the practice and procedure in the supreme court upon such review," became the law. The act contained an unlimited and unqualified express repeal of all acts and parts of acts in conflict with its provisions. Section 6 of the act is as follows: "Upon appeal from a final judgment the court shall review all orders and rulings made by the court below, which are assigned as error, whether a motion for a new trial is made or not. If a motion for a new trial is made and denied, the court may, on appeal from the final judgment, review the action of the court below in denying the motion, though no appeal be taken from the order

denying the motion for a new trial; provided, that on appeal from a final judgment the supreme court shall not consider the sufficiency of the evidence to sustain a verdict or judgment in an action tried before a jury unless a motion for a new trial shall have been made.'' (Sec. 1231, Rev. Stats. 1913, Civil Code.)

The act is applicable to judgments of the district courts, for such judgments are now the judgments of the superior courts. Article 22, section 7, of the Constitution, reads: ''The records, papers, and proceedings of said district court, and other property pertaining thereto, shall pass into the jurisdiction and possession of the superior court of such county''— the evident purpose of this provision being to establish the judgments rendered by the district court prior to statehood as the judgments of the superior court. A similar provision of the law was before the court in the case of *Merchants' Bank* v. *Braithwaite,* 7 N. D. 358, 66 Am. St. Rep. 653, 75 N. W. 224. Chief Justice CORLISS said: ''By this section the people speaking through their fundamental law, have, with the assent of Congress, vested jurisdiction over judgments of the territorial district courts, in the proper state district court, and the judgments were thereafter as much judgments of the state district court as though they had been rendered by such courts.''

Recognizing the far-reaching effect of an unconditional repeal, the legislature enacted a section (5560) which went into effect at the same time as Senate Bill No. 108. It reads: ''No action or proceeding commenced before any repealing act takes effect and no right accrued is affected by the provisions of such act, but proceedings therein must conform to the requirements of the acts passed at the same session of the legislature so far as such last-mentioned acts are applicable.'' This seems to be an emphatic expression of the legislative intent that the provisions of act No. 108 should govern this court in reviewing pending appeals. Such intent becomes more obvious when it is considered that the law was enacted at the suggestion of this court that the apparent technicalities in the law should be expunged, to the end that this court might not be constrained to render decisions as the result of a restricted power of review. That the removal of such restrictions would enable it to proceed and render its decisions

upon the merits of the causes presented, unencumbered with
those considerations which probably appeared somewhat tri-
fling, but which involved us in an obedience to the will of the
law—in a recognition and application of the law as it is writ-
ten.    Having determined that there is but one appeal under
the laws of 1901, and that the method of taking and perfecting
such appeal affects the jurisdiction of this court—in other
words, enlarges or circumscribes our power to hear and deter-
mine the case on the record as presented—the crux of the
present motion for a rehearing lies in an answer to this ques-
tion: Has the appellee a vested right in the method of taking
and perfecting an appeal as it existed when the judgment at
bar was given?    An answer to this question is a solution of
the problem presented.

In the case of *Pearsall* v. *Great Northern Ry.*, 161 U. S.,
at page 673, 16 Sup. Ct. Rep., at page 713, 40 L. Ed. 838,
quoting Mr. Justice COOLEY, it is said: ''Rights are vested,
in contradistinction to being expectant or contingent.    They
are vested, when the right to enjoyment, present or pros-
pective, has become the property of some particular person
or persons as a present interest.    They are expectant, when
they depend upon the continued existence of the present con-
dition of things until the happening of some future event.
They are contingent, when they are only to come into exist-
ence on an event or condition which may not happen or be
performed until some other event may prevent their vesting.''

A ''vested right'' is defined to be an immediate fixed right
to present or future enjoyment, or where the interest does not
depend on a period, or an event, that is uncertain.    *Clark* v.
*McCreary*, 20 Miss. (12 Smedes & M.) 353; *Oriental Bank* v.
*Freeze*, 18 Me. 109, 36 Am. Dec. 701; *Edworthy* v. *Iowa,* 114
Iowa, 220, 86 N. W. 315; *Gladney* v. *Sydnor*, 172 Mo. 318,
95 Am. St. Rep. 517, 60 L. R. A. 880, 72 S. W. 554.

After this judgment was rendered, a motion for a new trial
was made, giving the lower court opportunity to correct any
error it may have made.    The motion was overruled.    At that
time the right of appeal existed.    An appeal was taken and
perfected.    By the method pursued in taking and perfecting
the appeal, however, we were restricted in our review of the
record.    The appellee could not have a vested right in the
judgment while the right of appeal existed, and so long as

the time for appeal had not expired. The appellee could never acquire a vested right in the judgment so long as it was subject to the decision and determination of the appellate court. On the appeal the judgment of the trial court was declared to be erroneous by the territorial supreme court and again by the supreme court of the state. Having determined that under the law there was but one appeal, to wit, an appeal from the judgment or an appeal from the judgment and order or orders, and an appeal having been taken and perfected from the judgment, but not including the order, thereby not destroying our jurisdiction, but restricting the scope of review, and the law now removing that restriction and broadening the scope of review to include the order, the right of the appellee to have that part of the controversy concerning the order foreclosed is in no sense a vested right. The legislature is not precluded from enacting a law to broaden the scope of our review upon the appeal to include the order. The appellee can have no vested right in a matter of procedure or in the method and mode by which a record on appeal is enlarged or restricted for presentation to the appellate court. *Andrade* v. *Andrade,* 14 Ariz. 379, 128 Pac. 813; *Johnson* v. *Semple,* 31 Iowa, 50; *Sumner* v. *Miller,* 64 N. C. 689; *Blonde* v. *Menominee Bay Shore Lumber Co.,* 106 Wis. 540, 82 N. W. 553; *De Cordova* v. *Galveston,* 4 Tex. 470; *Willard* v. *Harvey,* 24 N. H. 344; *Bank* v. *Miller,* 145 Ala. 237, 40 South. 513; *Buck* v. *Canty,* 162 Cal. 226, 121 Pac. 924; *Clark* v. *Railroad,* 219 Mo. 524, 118 S. W. 40. The appellee can have no vested right in preventing the law-making power from changing the mode and method of review. "If a statute providing a remedy is repealed while proceedings are pending, such proceedings will be thereby determined, unless the legislature shall otherwise provide, and, if it be amended instead of repealed, the judgment pronounced in such proceedings must be according to the law as it then stands." Cooley's Constitutional Limitations, 7th ed., p. 516.

In *Cassard* v. *Tracy,* 52 La. Ann. 835, 49 L. R. A. 272, 282, 27 South. 368, will be found a learned and exhaustive consideration of this matter. The court says in the opinion: "The first question is as to the effect of a suspensive appeal upon the judgment appealed from. The Code of Practice declares that a judgment from which a suspensive appeal has

been taken cannot be executed. Code Prac., art. 575. That same is not a final and definitive judgment. The very object of the appeal is to keep the controversy open, obtain a review of the law and evidence upon which same is predicated, and, if possible, to obtain a different decree in the appellate court. The effect of an appeal was very thoroughly considered in the case of *Beaird* v. *Russ,* 34 La. Ann. 315. A judgment which cannot be executed, and which may be reversed on appeal, cannot certainly possess any value as a piece of property, inasmuch as the title is defeasible and conditional. The very object of taking a suspensive appeal is to prevent the decree having any effect, and to prevent its execution. This being the case, it is not readily perceivable upon what ground the argument is predicated that a law enacted during the interim of the suspensive appeal would have the effect of impairing the right of the judgment creditor; the right being defeasible and conditional. . . . The plaintiff's right to the judgment necessarily depended upon its affirmance in the appellate court; for, if same should be reversed in the court of appeals, or by this court in reviewing the same, there would be no property in it at all. The right of property in a judgment of the district court, suspensively appealed from, would be necessarily extinguished by its reversal.''

It is only after existing remedies have been exhausted, and rights have become permanently vested, that interference with the mere remedy is prohibited. *Smeaton* v. *Austin et al.,* 82 Wis. 76, 51 N. W. 1090; *Lovell* v. *Davis,* 52 Mo. App. 342; *Vance et al.* v. *Rankin et al.,* 194 Ill. 625, 88 Am. St. Rep. 173, 62 N. E. 807; 1 Haynes on New Trial and Appeal, Rev. ed., sec. 9; 3 Cyc. 407.

By the later decisions of Oklahoma, notably the case of *Independent Oil Co.* v. *Beacham,* 31 Okl. 384, 120 Pac. 969, the supreme court of that state, having under consideration provisions of the Constitution similar to section 1 and section 2 of article 22 of the Constitution of Arizona, drew a distinction between rights existing at the time of statehood and not in suit and actions in suit pending at the time of statehood; that as to the latter the procedure involved was within the protection of the Constitution. In the case of *Andrade* v. *Andrade, supra,* we had occasion to cite the Beacham case in support of the rule that ''no person has a

vested right in any particular mode of procedure, and if, before the trial of the cause, a new law of procedure goes into effect, it governs, unless the statute provides otherwise.'' We did not yield to the test applied in that case, which was whether the suit was pending or not pending at the time of the admission of the state; but following the quotation from that opinion, we did cite *Cusic* v. *Douglas,* 3 Kan. 123, 87 Am. Dec. 458, *Kelly* v. *Larkin,* 47 Cal. 58, and other cases where the new procedure was held applicable to pending cases as well as rights existing but not in suit. The construction given by the supreme court of Oklahoma was, perhaps, impelled by the unique situation of two territories, the Indian Territory and Oklahoma Territory, each with separate and distinct laws, and which separate territorial governments were molded into one sovereignty under statehood, a situation peculiar to that jurisdiction, but not existing here. In the Beacham case the Oklahoma court departed from an earlier construction which included both existing rights and pending actions, and limited the protection of the constitutional provision to actions pending at the time of statehood, but denying its protection in matters of procedure to rights existing at statehood and not in suit. Pending cases, in all probability, in most instances had been disposed of, and had not the court departed from its earlier decisions there would have been fastened upon Oklahoma a dual system of procedure to plague the courts and litigants for many years to come with confusions and embarrassments in the administration of the law. Further than this, we do not read the Oklahoma decisions as denying to the legislature the power to change the law of procedure governing actions pending. The broad general scheme of sections 1 and 2 of article 22 of our Constitution is to preserve rights, actions, contracts, claims, etc., that no abruptness might occur in the change from a territory to a state, that the administration of the law should proceed unaffected by any change in the form of government, that the change should in no wise affect existing rights; not that new laws may not be enacted affecting or regulating the remedy for the enforcement of those rights.

We think that Senate Bill No. 108, therefore, governs us in the scope of our review on appeals pending. The appellant had the right of appeal and exercised the right, and the

appellee had no vested right in having the mode of taking the appeal, or the scope of our review on the appeal remain as it was when the judgment was rendered. The construction we have given is favorable to the remedy; it gives us the power to fully review the case upon its merits and do justice as the law and the facts require. Such a construction denies the appellee no right and should be given to the act.

We are satisfied the judgment of this court is correct, and it would be to no purpose to grant the rehearing and thereupon render the same judgment. The desired end is accomplished by denying the motion and letting the judgment stand.

The motion for a rehearing is denied.

ROSS, J., concurs.

CUNNINGHAM, J., Dissenting.—Senate Bill No. 108 was approved April 1, 1913, and became effective on October 1, 1913. The judgment by this court was entered on January 27, 1913. The scope of review at the time this court had this cause before it for that purpose was limited to a review of the judgment-roll only. *Arizona Eastern R. Co.* v. *Globe Hardware Co.,* 14 Ariz. 397, 129 Pac. 1104; *Miami Copper Co.* v. *Strohl,* 14 Ariz. 410, 130 Pac. 605; *Van Dyke* v. *Cordova Copper Co.,* 14 Ariz. 499, 132 Pac. 94; *Thomas* v. *Bartleson,* 14 Ariz. 513, 131 Pac. 973.

If it be conceded that the provisions of Senate Bill No. 108 have a retrospective effect upon the scope of review, which I do not concede, then in order to justify a review of the questions properly triable upon the motion for a new trial, in the hearing of an appeal from a final judgment, such appeal must have been taken "from a final judgment of the superior court in a civil action, or special proceeding commenced in such court, at any time within six months after the rendition of such judgment, and from any other judgment or order at any time within sixty days after the making of such order." Sec. 1231, Rev. Stats. Ariz. 1913, Civil Code.

The fact is that this is not an appeal from a final judgment of the superior court in a civil action commenced in such court, but it is an appeal from the final judgment of the territorial district court commenced in such district court.

The motion for a rehearing does not have the effect to vacate the judgment, but its effect, and only effect, is to sus-

pend further proceedings in the matter of carrying out the judgment. The proceedings of review upon appeal were closed when that judgment was rendered on January 27, 1913. The motion for a rehearing, if granted, would reopen the case for further consideration. If the judgment was void for want of jurisdiction at the time it was rendered, to refuse to grant a rehearing upon that ground would not validate a void judgment. The judgment must remain a judgment of this court of the date of its rendition, and the procedure carrying that judgment into effect was suspended by the motion for a rehearing from the date of rendition to the date of the order refusing a rehearing and as provided by law. Legislation which affects the procedure of this court after a cause has been submitted and a judgment has been rendered therein cannot have any bearing upon such a judgment, simply because a motion for a rehearing is pending. If the motion is granted, the cause is not again open for resubmission, but remains submitted for consideration upon the order of submission. It is my opinion that, where a cause is regularly ordered submitted for the consideration of a court, no change in procedure made thereafter can affect the consideration of such cause. A legislative change of a rule of evidence made after a cause has been submitted to a jury for consideration cannot be permitted to affect the consideration of a cause submitted to the jury. When a cause has been submitted to a court or to a jury, its consideration depends solely upon the law in force at the time of submission. Had the changes in procedure been made before the cause was submitted, then the question whether the changed procedure would apply to such cause would arise. No such question is before this court upon the consideration of a motion for a rehearing.

The court upon the hearing of this cause reviewed the questions of fact not properly before the court for the reason no appeal was perfected from the order of the court refusing a new trial. It is my opinion such action was without authority, and the only matter which the court could properly consider was the judgment-roll. So considered, the judgment should have been affirmed, as no reversible error appears upon the face of the judgment-roll.

I adhere to my former views, if the evidence is considered. The facts create a trust relation, making Steinfeld a trustee,

with a duty cast upon him as such by the terms of his contract to account for the stock or its proceeds transferred to him by the husband of, and by, the appellee. He procured possession and apparent title to the stock through his promise to treat the parties right and received the conveyance of the stock through the efficacy of that promise, and the court of equity should enforce the spirit of the agreement. That Steinfeld intended to appropriate the dividends payable on the stock before he paid for the stock and out of such dividends pay the purchase price of the stock is the best evidence that no consideration passed supporting the contract of purchase. Such a contract is like one which would employ a fisherman to fish in the public waters upon a promise to give such fisherman a third part of the catch.

The judgment ought to be affirmed: First, because the appeal perfected was from the judgment and no reversible error appears in the judgment-roll; and, second, if the facts are before us for review, the judgment ought to be affirmed, because those facts support the judgment appealed from. I still persist in dissenting, regardless of the majority opinion, and its strictures upon those who cannot understand its terms.

NOTE.—On the question of the liability of the directors of a corporation to the corporation, see note in 55 L. R. A. 751.