CONCURRING: PHILIP G. ESPINOSA and STEPHEN F. McCARVILLE, Judges.*

287 P.3d 807

David CARUTHERS and Ruby Rumiko Tanouuye, husband and wife; Kyle T. Underhill; Lawrence J. Warfield, Trustee of the Chapter 7 Bankruptcy Estate of Helena Underhill; Chester W. Allen; and William G. MacBeth, Plaintiffs/Appellants,

v.

Clinton T. UNDERHILL and Kimberly Underhill, husband and wife; James A. Underhill, a single man; Underhill Holding Company, Inc., a Nevada corporation, Defendants/Appellees.

No. 1 CA–CV 10–0664.

Court of Appeals of Arizona, Division 1, Department D.

Oct. 9, 2012.

* A judge of the Pinal County Superior Court authorized and assigned to sit as a judge on the Court of Appeals, Division Two, pursuant to Arizona Supreme Court order filed August 29, 2012.

**516**

Aiken Schenk Hawkins & Ricciardi, PC by Joseph A. Schenk and Robert C. Van Voorhees, Phoenix, for Appellants.

Jennings, Strouss & Salmon, PLC by Michael J. O'Connor and John J. Egbert, Phoenix, for Appellees Clinton T. Underhill, Kimberly Underhill and James A. Underhill.

Kercsmar & Feltus, PLLC by Geoffrey S. Kercsmar and Gregory B. Collins, Scottsdale, for Appellee Underhill Holding Company, Inc.

## OPINION

THOMPSON, Judge.

¶ 1 This case involves the purchase of shares between cousins in a closely held family business. Plaintiffs Kyle Underhill (Kyle) and Helena Underhill (Helena and, collectively, plaintiffs) appeal from a grant of summary judgment in favor of defendants Clinton Underhill (Clinton) and James Underhill (James) and from an award of attorneys' fees to Underhill Holding Company, Inc. (UHC). Plaintiffs alleged that Clinton, an officer in UHC, fraudulently misrepresented the value of the UHC stock and that Clinton's father James and UHC conspired with and aided and abetted his efforts. Plaintiffs alleged Clinton possessed special facts regarding the value of the shares that he was legally required to share with plaintiffs prior to purchase. Because we agree with the trial court that there was no evidence of material facts possessed by Clinton which were not available to plaintiffs, we affirm.

## FACTUAL AND PROCEDURAL HISTORY

¶ 2 UHC is a holding company whose wholly owned subsidiary, Underhill Transfer Company (UTC), owns and manages commercial real estate. James and John Underhill, Jr. (John Jr.) are the sons of John Underhill, Sr. (John Sr.) and Diane Underhill. Clinton is the son of James; Kyle and Helena are grandchildren of John Sr. and cousins of Clinton.[1]

---

1. While Kyle and Helena are consistently represented as grandchildren of John Sr. and cousins of Clinton, the record is vague as to whom their parents are. Kyle and Helena do not appear to

¶ 3 John Sr. was Chairman of the Board from 1965 through March 2006.[2] In 1992, John Sr. and Diane, transferred ownership of most of their stock to their children and grandchildren. As of 1996, 1159 shares of UHC stock were outstanding. John Jr. and James, the surviving sons of John Sr. and Diane, had 449 shares each and each grandchild, including Kyle and Helena, had twelve shares of stock. Nonfamily members also possessed shares of stock.

¶ 4 In July 2004, Diane died. At the time of her death, Diane owned UHC stock. John Sr. hired Jeffrey B. Polston, a certified public accountant, to provide an independent valuation[3] of the stock. Before Polston completed his valuation, John Sr. filed an estate tax return valuing her shares of UHC stock at $8000 each. Polston later opined that each share of UHC stock had a value of $6000. In reaching this number, Polston determined the market value of each share to be $10,733, he then applied an eighteen percent minority interest discount and a thirty-two percent lack-of-marketability discount.

¶ 5 In early 2006, Wells Fargo Bank engaged an appraiser to conduct an independent appraisal of UTC's principal real estate assets. The 2006 appraisal was completed in March 2006, and a written copy received by UHC in early May. The 2006 appraisal valued UTC's major real estate asset at $35,000,000. The 2006 appraisal did not value the UHC shares.

**The Share Purchases**

¶ 6 Kyle worked for UHC, in charge of maintenance for the shopping center and hotel, and would stop into the office several times a week to talk to Clinton. In December 2005, Clinton asked Kyle if he wanted to sell his twelve shares of UHC stock. The two had discussions about it over several months. Clinton offered Kyle $6000 per share. During one of the conversations, Clinton showed Kyle at least part of the 2004 valuation; Kyle glanced at it but did not ask for a copy. On March 24, 2006, Kyle signed a written agreement selling his twelve shares to Clinton for $6000 per share. The agreement stated, "By signing below, I am aware that the value of the stock to be transferred might be of greater or lesser value, but agree to sell for the amount above." According to Kyle, before he sold the stock, James told him several times that the shares were worthless. After the sale, Kyle spoke with James, who told him selling was a good idea because otherwise Kyle would receive nothing for the shares. John Sr., who overheard the conversation, told Kyle that James was wrong and that selling the stock for $6000 was a mistake.

¶ 7 In late 2005, Helena called UHC to inquire about selling her shares; Clinton answered the telephone and offered to buy her shares. Helena and her then-husband Mark had multiple conversations and emails with Clinton over the next several months. Clinton offered her $6000 per share, representing that a valuation existed showing that the shares were valued at a "whopping $6,000." Clinton did not disclose that the valuation was two years old or that an appraisal was in the process of being prepared. Prior to her selling her shares, John Jr. advised Helena that he believed the value to be higher than the $6000 Clinton was paying; Helena contended Clinton told her husband that John Jr.'s value was based on false information. Helena spoke to Kyle, who said their grandfather told him that James's statements that

be the children or siblings of any other party in this appeal, nor is it relevant.

2. John Sr. turned over active management of UTC and UHC to James in 2002. Between 2005 and 2006, Clinton and James were officers and directors of UTC and UHC.

3. The "2004 valuation" is a twenty-nine page document dated October 15, 2005, which was prepared to value UHC stock as of July 14, 2004, for Diane's estate tax return. The "2006 appraisal," supra, is a document of over 200 pages prepared at the request of Wells Fargo to determine the market value of a major subsidiary (UTC) asset, namely, a mixed use shopping center including a hotel, grocery store and gas station in Yuma.

We use the terms valuation and appraisal as they are used in the record on appeal. We do not examine the underlying numbers, how an appraisal or valuation might differ in scope or how the purpose behind such determination, such as if prepared for estate purposes or for an increase in a credit line, might affect the result.

the stock was worthless were not true. On March 29, 2006, Helena sold seven of her twelve UHC shares to Clinton for $6000 per share. She executed an agreement, stating "By signing below, I am aware that the value of the stock to be transferred might be of greater or lesser value, but agree to sell for the amount above."

¶ 8 On April 7, 2006, Helena received an email from John Jr. explaining that a plan was being developed whereby he would sell his shares to the company. The email stated that Clinton, in anticipation, was trying to buy as many shares as possible using the estate valuation for the $6000; John Jr. asserted that Clinton knew the true per share value was about $25,000. John Jr. suggested Helena contact her grandfather if she had questions and to cancel the sale of her shares if possible. Helena did not attempt to contact John Sr. or John Jr. to obtain additional information. In June and July 2006, Helena's husband, with her knowledge and approval, emailed Clinton about purchasing her remaining shares. As late as May 2007, Helena was still offering to sell her shares to Clinton.

¶ 9 During the period when Clinton was purchasing the UHC shares, he and James were in a dispute with John Sr. and John Jr. over the future of UTC and UHC. Clinton was attempting to purchase sufficient shares so he and James, collectively, would have a controlling interest. James made an undocumented $300,000 loan to Clinton, which he assumed Clinton would use to purchase shares of stock. James also co-signed another loan to Clinton for $200,000 for Clinton to purchase UHC stock.

### The Lawsuits

¶ 10 Kyle and Helena, as well as several other shareholders[4] who had sold UHC stock to Clinton, filed suit against Clinton, James, and UHC. Plaintiffs asserted claims against Clinton for breach of fiduciary duty, common law fraud, consumer fraud, and securities fraud. Plaintiffs alleged Clinton improperly used the 2004 valuation to support his purchase offers although he knew that the 2006 appraisal valued one major UTC asset at $35,000,000. Plaintiffs alleged that Clinton and James had been informed repeatedly that the UHC stock had a fair market value of at least $20,000 to $25,000; they alleged that the actual value of the stock was $29,315. The complaint contended that Clinton misrepresented the value of the UHC stock by stating or implying that the 2004 valuation represented current financial information, by indicating that he was purchasing the stock on behalf of the Underhill family, by failing to disclose the existence of the forthcoming 2006 appraisal, and by failing to disclose the internal struggle for control of the company. These misrepresentations, they assert, allowed Clinton to purchase the stock for substantially less than fair value.

¶ 11 The complaint asserted claims against James and UHC for aiding and abetting, contending among other things that they had prior knowledge of Clinton's actions, assisted him by providing funds to support Clinton's purchase of the shares, and by not informing shareholders that the value of the stock exceeded the amount offered by Clinton. The complaint alleged conspiracy by Clinton, James, and claimed UHC was vicariously liable, and claimed a fraudulent transfer by Clinton and James for UHC's purchase of property from Clinton's brother-in-law after which the brother-in-law made a loan to Clinton to purchase shares of stock, with the loan secured by a stock pledge.

### The Summary Judgment Motions

¶ 12 Clinton, James, and UHC moved for summary judgment. Clinton argued that Kyle and Helena could not establish any actionable misrepresentation of material fact, any violation of duty, or any justifiable reliance. Clinton argued that even if his offer of $6000 per share constituted a representation of value, it was not actionable because it was merely his opinion. Clinton asserted he had no duty to disclose any information to Kyle or Helena and plaintiffs could not show justifiable reliance because over several months of negotiating, neither made a counteroffer, sought additional financial information or

---

4. The claims of stockholders other than Kyle and Helena are not at issue in this appeal.

consulted their grandfather. Further, they both signed agreements recognizing that the value of the share might be more or less than the purchase price.

¶ 13 In response, Kyle and Helena argued that Clinton, as an officer and director of UHC, had a fiduciary duty to disclose material facts concerning the value of the shares he was purchasing. They contended that under the modern view officers and directors have an affirmative duty to shareholders to disclose all material facts that might affect the value of shares being purchased. Plaintiffs acknowledged that, under the older view, officers and directors had no special duty to shareholders when buying shareholder stock other than to refrain from making affirmative misrepresentations unless they were aware of "special facts" not generally known to the shareholder that would affect the value of the stocks; they contended, however, that Clinton was aware of special facts which he had a duty to disclose.

¶ 14 Clinton's father, James, moved for summary judgment against all shareholder plaintiffs. With respect to Kyle and Helena, he argued that they could not establish a valid claim that he aided and abetted Clinton because Clinton did not commit any tort, because there was no evidence that James knew Clinton intended to commit a tort, and because there was no evidence that James substantially assisted Clinton to commit any tort. James contended that he had no contact with Helena prior to her sale and his only contact with Kyle prior the sale were conversations telling Kyle that the sale of shares to Clinton was a good deal. James also asserted that, while he assumed that Clinton would use the loan to purchase shares and he while may have been aware of the price Clinton offered, there was no evidence that he assisted with or participated in any misrepresentation or omission to commit tortious conduct.

¶ 15 In response, plaintiffs argued that James knew that Clinton was purchasing shares of UHC stock to achieve a majority interest with him, knew that John Sr. and John Jr. valued the stock higher than the amount Clinton was offering, and knew of the 2006 appraisal and, therefore, knew that Clinton was buying the stock at substantially less than value, yet when asked James still told Kyle and Helena that the stock was worthless.

¶ 16 UHC moved for summary judgment asserting Kyle and Helena presented no evidence that UHC knew of or participated in Clinton's actions. UHC noted that, at the time of the purchases, Clinton and James did not control UHC and therefore UHC could not have participated in Clinton's actions.

### Trial Court Rulings

¶ 17 Clinton's motion for summary judgment against Kyle and Helena was granted. The court held that a corporate officer such as Clinton may purchase stock from shareholders as from a stranger so long as the purchaser does not actively mislead the seller, and that the officer has no duty to disclose inside information, unless that information materially affects the value of the stock. The court further held that the officer has only a limited fiduciary duty to disclose material inside information to an uninformed shareholder, but that the officer has no duty to disclose the "special facts" if they are known by or equally accessible to the shareholder.

¶ 18 The court noted that Clinton could be liable if he had made affirmative misrepresentations but found no evidence that Clinton ever actually represented that $6000 was the fair market value, only that he had offered $6000. That offer was an opinion, not a material misrepresentation. The court determined that Clinton's references to the 2004 valuation or any failure to disclose that it was prepared for tax purposes to not be material misrepresentations. The court noted the 2004 valuation Clinton showed Kyle expressly stated it was prepared for tax purposes. Clinton's reference to the 2004 valuation as to Helena was that the valuation showed shares at a "whopping $6,000," viewing the evidence as a whole, the court found that statement was again an opinion, not a material misrepresentation. The court found Clinton's claimed response to Helena's husband's question as to whether he was planning a hostile takeover that "ain't nothing hostile about owning 12 shares," was more

soft information not a material misrepresentation because it was part of Clinton's "personal feelings, opinions and motives." The court determined that such "soft information" as asset appraisals, projections, estimates, opinions, motives and the intentions of the purchasing parties were not always per se immaterial, in this matter they were because they were not objectively verifiable.

¶ 19 The court held that the special facts exception did not apply to Kyle and Helena because at the time of the sales of their shares, Clinton did not yet have the 2006 appraisal and they both had access to the opinions and estimates of John Sr. and John Jr. regarding the appropriate value for their shares. The court determined that, even if the special facts exception applied and Clinton was required to disclose special facts to Kyle and Helena, they could not show Clinton failed to disclose any material fact because the subjective estimates of value by John Sr., John Jr., or Clinton were not material. With respect to the plaintiffs' claim that Clinton should have told them he was attempting to obtain a controlling interest in UHC, the court found that his motives were likewise not special facts that he was required to disclose. The court granted summary judgment to Clinton on all of Kyle and Helena's claims.[5]

¶ 20 The court granted summary judgment in favor of James and against Kyle and Helena, finding that, in light of the court's ruling in favor of Clinton, their claims for aiding and abetting and conspiracy necessarily failed.

¶ 21 The court granted summary judgment in favor of UHC against all the shareholder plaintiffs. With respect to Kyle and Helena, the court relied on its prior determination that they had not presented evidence that Clinton had committed a tort. With respect to the other shareholders, the court found that any knowledge of James or Clinton could not be imputed to the company and therefore the shareholders could not establish any claim of aiding and abetting or conspiracy. The court also rejected the vicarious liability claim, finding that Clinton and James' actions did not fall within the course and scope of their corporate duties.

¶ 22 Kyle and Helena filed a motion to reconsider the entry of summary judgment in favor of Clinton and James; the court denied the motion.

¶ 23 UHC filed an application for attorneys' fees pursuant to Arizona Revised Statutes (A.R.S.) section 12–341.01 as a matter arising out of contract. UHC asserted that the sales agreements with Clinton and Clinton's alleged fraud in inducing the sales were the essence of the plaintiffs' claims and thus UHC was eligible for an award of fees. UHC noted that the plaintiffs had sought attorneys' fees in their complaint.[6] UHC sought attorneys' fees in the amount of $276,140.50 and costs of $4,204.99.

¶ 24 Plaintiffs objected, arguing that the claims against UHC were for aiding and abetting and conspiring to commit Clinton's torts and as such did not arise out of contract. They argued that UTC, not UHC, paid the bills and so UHC could not receive an award of fees. The court found that the matter arose out of contract and awarded attorneys' fees to UHC in the amount of $138,000 against the six shareholder plaintiffs.

¶ 25 The court entered judgment on July 22, 2010, and certified it as final pursuant to Rule 54(b). Kyle and Helena timely appealed.

## DISCUSSION

¶ 26 Summary judgment may be granted when "there is no genuine issue as to any material fact and [ ] the moving party is entitled to judgment as a matter of law." Ariz. R. Civ. P. 56(c). Summary judgment

---

5. With respect to the claims of the other shareholders, the court found that whether the 2006 appraisal was material information that needed to be disclosed was a material issue of fact, because the 2006 appraisal had been completed when Clinton gave the other shareholders the 2004 valuation.

6. The Supplemental Second Amended Complaint seeks attorneys' fees for all but the negligent misrepresentation claim and cites A.R.S. § 12–341.01 as the basis for a fee award with respect to the breach of fiduciary duty claim.

should be granted "if the facts produced in support of the claim or defense have so little probative value, given the quantum of evidence required, that reasonable people could not agree with the conclusion advanced by the proponent of the claim or defense." *Orme School v. Reeves,* 166 Ariz. 301, 309, 802 P.2d 1000, 1008 (1990). In reviewing a motion for summary judgment, we determine de novo whether any genuine issues of material fact exist and whether the trial court properly applied the law. *Eller Media Co. v. City of Tucson,* 198 Ariz. 127, 130, ¶ 4, 7 P.3d 136, 139 (App.2000). We view the facts and the inferences to be drawn from those facts in the light most favorable to the party against whom summary judgment was entered. *Prince v. City of Apache Junction,* 185 Ariz. 43, 45, 912 P.2d 47, 49 (App.1996). Our review is limited to the evidence presented to the trial court at the time it considered the motion. *GM Dev. Corp. v. Comty. Am. Mortg. Corp.,* 165 Ariz. 1, 4, 795 P.2d 827, 830 (App.1990).

¶ 27 Kyle and Helena appeal the trial court's decision with respect to their claims against Clinton for breach of fiduciary duty, common law fraud, and securities fraud. With respect to each of these claims, plaintiffs must establish that a genuine issue of material fact existed regarding material affirmative misrepresentations or, if a duty to disclose existed, material omissions by Clinton. *See Haisch v. Allstate Ins. Co.,* 197 Ariz. 606, 610, ¶ 14, 5 P.3d 940, 944 (App. 2000); A.R.S. § 44–1991(A) (2003). An officer or director purchasing stock from a shareholder may not affirmatively mislead the seller. *Steinfeld v. Nielsen,* 15 Ariz. 424, 444, 139 P. 879, 888 (1913).

### Clinton's Alleged Misrepresentations

¶ 28 On appeal, Kyle and Helena assert that Clinton made affirmative misrepresentations to Kyle when he offered to buy Kyle's shares for $6000 and told Kyle that a valuation supported that amount. With respect to Helena, they claim that Clinton made an affirmative misrepresentation by telling her that $6000 was a fair price for her stock, and when he later told her husband that there was a valuation valuing the shares at a "whopping $6,000." A misrepresentation is material if a reasonable person "would attach importance to its existence or nonexistence in determining [his or her] choice of action in the transaction in question." Restatement (Second) of Torts § 538(2)(a) (1977).

¶ 29 As to the alleged misrepresentation to Kyle, Kyle and Helena assert that the claim that a valuation supported the $6000 offer combined with the failure to disclose that the valuation was from 2004 and was prepared for estate tax purposes created a misrepresentation that $6000 was the fair value of the stock. The record shows, as the trial court noted, that Clinton showed Kyle a copy of the 2004 valuation. Indeed, the complaint states Clinton "showed Kyle a document entitled Business Valuation dated July 14, 2004." The third page states that the document was an opinion on the fair market value of one share "as of July 14, 2004 for the purpose of preparation of an estate tax return." At his deposition, Kyle stated he could not recall if Clinton showed him the valuation, then after reviewing the complaint, agreed he had been shown the document but did not remember looking over the whole document, stating that he believed Clinton might have shown him only a few pages. Kyle further testified that he might have glanced at the document but never asked for a copy of it.

¶ 30 That valuation includes the information Kyle claims was not disclosed, and Kyle has not presented evidence to establish that the pertinent information was not included in what Clinton showed him. This evidence does not create a disputed issue of material fact.

¶ 31 As to the alleged misrepresentation to Helena, the record does not support that Clinton told Helena that the $6000 was a fair value for the stock. The portions of the record cited for that statement say only that Clinton offered to pay Helena $6000. Kyle and Helena respond that Clinton made the offer when Helena called UHC to find out the value of her shares and that, in that context, the offer was a misrepresentation. Kyle and Helena do not direct us to any

evidence in the record to show that Helena ever asked what the shares were worth to allow the inference that the offer was a representation of value. Helena's declaration states: "I was trying to get my financial affairs in order and I called UHC to get some information. My cousin, Clinton Underhill, answered the phone. He offered to buy my UHC stock for $6,000 per share." Nowhere in this statement does Helena avow that she asked Clinton what her shares were worth or that Clinton told her that her shares were worth $6000.

■ ¶ 32 Helena also claims misrepresentation based on Clinton's statement to her husband that a valuation showed the shares at a "whopping $6,000" without disclosing that the valuation was from 2004 and was for tax purposes only. We agree with the court that, looking at the evidence as a whole, this does not constitute a material misrepresentation. First, that the 2004 valuation supported a $6000 value was an accurate statement. As for the failure to disclose the nature of the valuation, other evidence in the record demonstrates that this was not material. The record shows that months after she sold the seven shares of stock to Clinton, Helena still wanted to sell the remaining five shares to Clinton for the same $6000 price. At that time, she knew from John Jr. that the appraisal was from 2004, that it was for tax purposes, and that the 2006 appraisal was complete. We agree with the trial court that to the extent that either the statement or omission constitute a representation by Clinton, that representation was an opinion. Expressions of opinion are not material facts sufficient to support a claim for fraud. *Frazier v. S.W. Sav. & Loan Ass'n*, 134 Ariz. 12, 15, 653 P.2d 362, 365 (App.1982).

**Clinton's Duty to Disclose and the Applicability Of "Special Facts"**

¶ 33 Kyle and Helena next argue Clinton is liable for his alleged failure to disclose certain special facts they claim were material.

■ ¶ 34 In Arizona, directors and officers of a corporation generally do not owe a duty to disclose inside information to a shareholder when purchasing that shareholder's stock, so long as the officer or director does not actively mislead the shareholder. *Steinfeld*, 15 Ariz. at 444, 139 P. at 888. However, if "special facts" exist, the officer or director has a limited fiduciary duty to disclose facts that affect the value of the stock being purchased. *Id.* at 445, 139 P. at 888. In recognizing the special facts exception, *Steinfeld* relied on *Strong v. Repide*, 213 U.S. 419, 29 S.Ct. 521, 53 L.Ed. 853 (1909). *Steinfeld* noted that the special facts in *Strong* were that the purchaser was a director of the corporation, owned seventy-five percent of the company's stock, was the administrator general of the company, and was the chief negotiator for the sale of company lands that would greatly increase the value of the stock. *Steinfeld*, 15 Ariz. at 445, 139 P. at 888. The negotiations for the sale were pending when the purchaser director bought the shares from a shareholder who was not a corporate officer, was not involved in managing the company, and was not involved in the sale of the property. *Id.* at 445–46; 139 P. at 888. The *Strong* court found that the purchaser director's failure to disclose the pending sale of company lands constituted fraud. *Id.*

¶ 35 *Steinfeld* distinguished the facts of *Strong* to find no special facts. *Id.* at 446, 139 P. at 888. Contrasting the sellers in *Strong* and *Steinfeld*, the seller in *Steinfeld* was a director of the company (which was a mining and smelting company), was the superintendant of the mines and the smelter, and had intimate knowledge of the value of the mines and the operation of the smelter. *Id.* at 446, 139 P. at 888. The court concluded that there were no special facts known to the buyer that were not also known to the seller. *Id.*

¶ 36 Arizona has not addressed the special facts doctrine further. The court here found that the special facts doctrine did not apply because Kyle and Helena had access to the opinions of John Sr. and John Jr. by virtue of their family relationship. Kyle and Helena argue that *Steinfeld* does not limit the applicability of the special facts doctrine based on the accessibility of information. Clinton argues that, under *Steinfeld*, the doctrine does not apply when the seller knew or should have known the undisclosed facts.

¶ 37 *Steinfeld* does not support limiting the application of the special facts doctrine based on accessibility of information. *Steinfeld* found that the doctrine did not apply because both buyer and seller were involved in the company and the seller knew the same facts as the buyer. 15 Ariz. at 445–46, 139 P. 879, 888. The *Steinfeld* court referred to one fact as something the seller "knew or should have known" in the context of the seller's intimate involvement with the operation of the company; it does not, as Clinton suggests, imply an obligation on the part of a non-insider shareholder to seek out available information. *Id.*

¶ 38 Clinton cites two cases in support of his position that we find unpersuasive. In *Adelson v. Adelson*, the court described the sale of shares at issue as a transaction between a father and a son "who was free to ask corporate insiders, and anyone else for that matter, for information bearing upon the value of his stock." 60 Mass.App.Ct. 753, 806 N.E.2d 108, 120 (2004). The court noted, however, that no circumstances existed creating a duty and that the jury found neither a misrepresentation nor a failure to disclose any material fact. *Id.* In other words, the court did not rely on the buyer's access to information. *Buckley v. Buckley* described the circumstances giving rise to a duty as involving facts "known by the officer ... not known by the stockholder, and not to be ascertained by an inspection of the books." 230 Mich. 504, 202 N.W. 955, 956 (1925). Again however, the court did not apply that standard.

¶ 39 The position that availability of information renders the special facts doctrine inapplicable was rejected in *Van Schaack Holdings, Ltd. v. Van Schaack*, where the court explained that it could find no case where the duty under the special facts doctrine was limited to information that could not be gleaned from corporate records, and explained that such a position was "antithetical" to the reason for imposing the duty, that is, to prevent "well-informed officers or directors from taking unfair advantage of uninformed minority shareholders." 867 P.2d 892, 898–99 (Colo.1994). In another case, the California Court of Appeals, in reviewing a jury instruction stating that a duty to disclose was created when a corporate officer or director has knowledge of facts affecting the value of its stock "which are not equally available to the stockholder," found the language regarding availability to be error and rejected any contention that the shareholder purchaser had a duty to investigate. *Jaynes v. Jaynes*, 98 Cal.App.2d 447, 220 P.2d 598, 600–01 (1950). Given the absence of any suggestion in *Steinfeld* that under the special facts doctrine, the officer or director is relieved of the duty to disclose facts if the seller has access to those facts, we find no such exception to the duty under the special facts doctrine exists.

¶ 40 Clinton contends that the special facts doctrine also does not apply because the facts at issue are not material. Clinton argues that typically special facts involve events such as prospective mergers or sales of corporate assets that would have increased the value of the stocks sold; Clinton notes correctly that no such events are present in this case.

¶ 41 Arizona has not considered what special facts impose a duty to disclose. The fact that the typical case may involve important or extraordinary facts does not mandate that a duty is imposed only in those circumstances. Facts that have been recognized as supporting a duty to disclose include:

> [T]he fact that the corporation is closely held and its shares are unlisted, the familial relationship of the parties, the forthcoming sale of corporate assets, the fact that the director initiates the sale, and the relative ages and experience in financial affairs of the director and stockholder.

*Van Schaack*, 867 P.2d at 897 (quoting 3A William M. Fletcher, *Fletcher Cyclopedia of the Law of Corporations* § 1171, at 395 (1986)). *Van Schaack* expressly rejects the position that the special facts doctrine is limited to only important or significant matters, noting that most cases that purport to hold that position actually expressly require disclosure of all material facts. *Id.* at 901. *Van Schaack* concluded that a corporate director or officer purchasing shares from a shareholder must disclose material facts and circumstances known by virtue of his corpo-

rate position that affect the value of the shares. *Id.* at 898.

¶ 42 *Steinfeld* does not address the question. *Strong,* however, the case on which *Steinfeld* relies, refers to one of the facts in that case as "a most material fact affecting the value of the. shares of stock of the company," implying if not stating that material facts affecting the value must be disclosed. *Strong,* 213 U.S. at 432, 29 S.Ct. 521. We conclude as did the trial court that special facts equate to material facts. Therefore, if the claimed omitted facts were material, then Clinton would have had an obligation to disclose those special facts.

¶ 43 The standard of "materiality" in securities cases contemplates "a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder" or "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976); *Rose v. Dobras,* 128 Ariz. 209, 214, 624 P.2d 887, 892 (App.1981) (adopting the *TSC Industries* standard as the standard for "materiality of omitted facts"). Materiality is generally a question of fact, but may be resolved as a matter of law where the information is so obviously important or unimportant to an investor that reasonable minds could not differ on the question of immateriality. *TSC Indus.* at 450, 96 S.Ct. 2126; *Garcia v. Cordova,* 930 F.2d 826, 829 (10th Cir.1991).

¶ 44 The facts that Kyle and Helena assert Clinton should have disclosed were that: (1) the 2004 valuation was nearly two years old and prepared for estate tax purposes; (2) the 2006 appraisal was being prepared; (3) Clinton and James valued the business assets at $30,000,000 which equated to a per share value of $21,570.32; (4) John Sr. estimated the value at $20,000 to $25,000 per share; (5) John Jr. estimated the value at $25,000 per share; (6) Clinton was not willing to sell his own shares for $6000, and (7) there was a dispute over control of UHC.

¶ 45 The estimates as to value by John Sr., John Jr., and James were opinions. Information that "inherently involves some subjective analysis or extrapolation, such as projections, estimates, opinions, motives, or intentions" is "soft information" which is generally not required to be disclosed. *Garcia,* 930 F.2d at 830; *Flynn v. Bass Bros. Enters., Inc.,* 744 F.2d 978, 985 (3d Cir.1984); *see also Frazier,* 134 Ariz. at 15, 653 P.2d at 365 ("Mere representations as to value are generally considered expressions of opinion and will not support a claim for fraud."). The materiality of soft information depends on the facts of each case, the dispositive factors being "the nature of the undisclosed information and its importance, reliability, and investor impact." *Thorne v. Bauder,* 981 P.2d 662, 664 (Colo.Ct.App.1998); *see also Garcia,* 930 F.2d at 830; *Flynn,* 744 F.2d at 985–86.

¶ 46 In *Thorne,* the court found that an appraisal by a broker was material and subject to disclosure. The court noted that the opinion was given by a professional disinterested expert, it was made for the purpose of determining the fair market value of all the capital stock, and had been requested by the purchasers a few months before they purchased the stock. *Thorne,* 981 P.2d at 665. The court also found that the reliability of the appraisal was enhanced by the fact that the broker had recently sold a neighboring business and was familiar with the market. *Id.*

¶ 47 The opinions of John Sr., John Jr., and James are not comparable. The opinions are not professional, expert valuations by disinterested parties, nor do they represent the view of the corporation as to the value of the corporate assets or its stock. Rather, the estimates are the opinions of individual shareholders that Kyle and Helena claim were jockeying for power within the company. Moreover, the origin and bases of these opinions are unclear. Under this situation, the opinions cannot be deemed material.

¶ 48 Kyle and Helena argue that Clinton's valuation of the business assets at $30,000,000 and the fact that Clinton himself would not have sold his stock for $6000 were

material facts that he should have disclosed. Clinton argues that the record contains no evidence that he believed the assets of the company were worth $30,000,000. Plaintiffs reply that Clinton asked Polston, the accountant, to conduct an analysis of the value of the shares on a liquidation basis and to use $30,000,000 as the value of the assets. The record shows that Clinton avowed that in April 2006 he received an email from John Jr. criticizing him for purchasing Kyle and Helena's stock, after which he called Polston to determine if the $6000 per share that he paid was consistent with Polston's calculations from the 2004 valuation. Clinton testified that he did not believe $30,000,000 was the value of the company and "would never have suggested or informed" Polston that the assets of the company were worth that sum. He stated he did not know how Polston came to use that number, and speculated that during his conversation with Polston he might have referred to John Jr.'s belief that the assets were worth $30,000,000. Polston testified that Clinton called and told him they were in the process of buying some shares and asked him to calculate what the cash distributed to shareholders would be if all the assets were sold and debts paid. Polston stated that Clinton had given him the $30,000,000 number, representing the gross proceeds that would be realized by selling the assets, as a starting point for the calculation.

¶ 49 Even if this could be construed as evidence of a belief by Clinton as to the value of the company's assets at the time of the conversation with Polston, it does not show such a belief at an earlier time when he negotiated with and purchased shares from Kyle and Helena. Evidence which merely tends to contradict Clinton's claim by creating a slight doubt is insufficient to withstand summary judgment. *See Orme School,* 166 Ariz. at 309, 802 P.2d at 1008 (a "scintilla" of evidence or that which creates the "slightest doubt" is insufficient). The conversation with Polston occurred on or about April 12, 2006, months after the parties began discussing their respective sales and more than two weeks after Clinton purchased the shares from both Kyle and Helena.

¶ 50 Kyle and Helena argue that Clinton would not have sold his own shares for $6000 was further evidence he was aware the amount offered was not fair and that he was obligated to disclose this fact. Clinton, when asked if he would sell his shares for $6000 per share, said he did not intend to sell his stock. He did not indicate that he would not sell because the price was too low. A shareholder might sell or not sell shares at a particular price for any number of reasons. That Clinton was not interested in selling his stock for the price he was willing to pay does not present a fact that a reasonable shareholder would consider important.

¶ 51 Kyle and Helena contend that the fact that the 2006 appraisal was being prepared was a material special fact Clinton should have disclosed. Given the evidence as a whole we conclude that this was not a material fact. During discussions about selling his shares to Clinton, Kyle did not negotiate regarding the price of the shares and did not ask for other appraisals or financial information for the company, and in fact when shown the 2004 valuation he merely glanced at it. Helena learned about the 2004 valuation and the 2006 appraisal in an email from John Jr. shortly after selling her shares. She nevertheless subsequently sought to sell her remaining shares to Clinton for the same price. Given Kyle's lack of interest in the valuation provided to him and Helena's continued desire to sell her shares at the same price after knowing about the 2006 appraisal, there was not a substantial likelihood that the fact that a new appraisal was pending would have assumed actual significance in their deliberations. *See TSC Indus.,* 426 U.S. at 449, 96 S.Ct. 2126.

¶ 52 Kyle and Helena assert that Clinton should have disclosed the existence of a dispute over control of UHC. Clinton testified that his motive in purchasing the stock was to have a greater voice in the company because he had decided to secure his future with UHC. He acknowledged that he was purchasing stock so that he and his father would together have a controlling interest. Clinton's motives and intent in purchasing the stock were "soft information." *See Garcia,* 930 F.2d at 830. Moreover, Kyle

and Helena do not point to any evidence as to how Clinton's motive pertains to the value of the shares.

¶ 53 Having concluded that the alleged omitted facts and the alleged misrepresentations were either not supported by the evidence or were not material, we affirm the trial court's judgment in favor of Clinton on the breach of fiduciary duty claim. Because the claims for fraud and statutory securities fraud also require showings of material misrepresentations, we affirm the trial court's judgment as to those claims as well. *See* A.R.S. § 44–1991(A) (2003); *Echols v. Beauty Built Homes, Inc.*, 132 Ariz. 498, 500, 647 P.2d 629, 631 (1982) (elements of fraud).

### Claims against James

▪ ¶ 54 Kyle and Helena's claims against James were for aiding and abetting and conspiring with Clinton. Both aiding and abetting and conspiracy require, as an essential element, the commission of a tort. *Wells Fargo Bank v. Arizona Laborers, Teamsters & Cement Masons Local No. 395 Pension Trust Fund*, 201 Ariz. 474, 485, ¶ 34, 38 P.3d 12, 23 (2002) (aiding and abetting); *Baker v. Stewart Title & Trust of Phoenix, Inc.*, 197 Ariz. 535, 545, ¶ 42, 5 P.3d 249, 259 (App.2000) (conspiracy). Because we have found that Clinton cannot be liable for a tort against Kyle and Helena, we affirm the court's judgment in favor of James.

### Award of Attorneys' Fees Below to UHC

▪ ¶ 55 Kyle and Helena argue that the trial court erred in awarding attorneys' fees to UHC pursuant to A.R.S. § 12–341.01 (2003), asserting that the claims against UHC did not arise out of contract and that UHC did not pay and is not obligated to pay the attorneys' fees incurred.

¶ 56 Kyle and Helena's claims against UHC were for conspiracy and aiding and abetting arising out of Clinton's conduct in purchasing their shares. With respect to each claim, Kyle and Helena themselves sought an award of attorneys' fees pursuant to A.R.S. § 12–341.01.

▪ ¶ 57 Under A.R.S. § 12–341.01(A), the court may award reasonable attorneys' fees to the successful party in any disputed action arising out of contract. A tort claim may arise out of contract if it could not exist "but for" the contract. *Hanley v. Pearson*, 204 Ariz. 147, 151, ¶ 17, 61 P.3d 29, 33 (App.2003) (citing *Sparks v. Republic Nat'l Life Ins. Co.*, 132 Ariz. 529, 543, 647 P.2d 1127, 1141 (1982)). The contract must be the essential basis of the action and not merely a factual predicate. *Hanley*, 204 Ariz. at 151, ¶ 17, 61 P.3d at 33. When the duty breached is implied by law or is based on statute, that is, where the defendant would have "a duty of care under the circumstances even in the absence of a contract," the claim does not arise out of contract. *Hanley*, 204 Ariz. at 151, ¶ 18, 61 P.3d at 33; *Ramsey Air Meds, LLC v. Cutter Aviation, Inc.*, 198 Ariz. 10, 15–16, ¶ 27, 6 P.3d 315, 320–21 (App.2000).

▪ ¶ 58 An action for fraudulent inducement can arise out of contract for purposes of A.R.S. § 12–341.01 where a party to a contract sues the other contracting party to invalidate the contract. *Marcus v. Fox*, 150 Ariz. 333, 335, 723 P.2d 682, 684 (1986). The cause of action for such a tort only exists due to the fraudulently induced contract. *Id.* at 336, 723 P.2d at 685. However, where a party to a contract sues a nonparty for fraudulently inducing him to enter into a contract with a third party, the claim does not arise out of contract. *Morris v. Achen Constr. Co.*, 155 Ariz. 512, 514, 747 P.2d 1211, 1213 (1987). In such a case, the duty not to commit fraud was not created by the contractual relationship but exists even in the absence of a contractual relationship. *Id.* Whether a cause of action arises out of contract is a question of law we review de novo. *Schwab Sales, Inc. v. GN Constr. Co.*, 196 Ariz. 33, 36–37, ¶ 9, 992 P.2d 1128, 1131–32 (App.1998).

¶ 59 UHC argues that *Marcus* controls. We agree. Like *Marcus*, the basis for Kyle and Helena's claims was their contention that Clinton had fraudulently induced them to enter into an agreement to sell their shares for less than their value. The claims against UHC likewise arose from its part in the same alleged fraudulent inducement. The tort

claims would not exist but for the allegedly fraudulently induced contract.

¶ 60 Kyle and Helena also contend that UTC, not UHC, paid the attorneys' fees and therefore, under A.R.S. § 12–341.01(B), UHC could not be awarded attorneys' fees. That statute provides that the successful party may be awarded attorneys' fees, but the award "may not exceed the amount paid or agreed to be paid." A.R.S. § 12–341.01(A), (B). The declaration of UHC's counsel submitted in support of UHC's application for attorneys' fees stated that, pursuant to its fee agreement with his firm, UHC was billed monthly for all attorneys' fees and other expenses incurred. It further noted that UHC had already paid for the vast majority of those fees and expenses.

¶ 61 Kyle and Helena argue that the existence of a fee agreement is controverted by billing statements that show the client as Underhill Transfer Company. Although the billing statements list Underhill Trading [sic] Company and not UHC next to "Client Number," UHC's counsel explained at oral argument that the firm's software allowed only one name. In addition, many of the invoices were addressed to Underhill Holding Corporation. The record sufficiently establishes that UHC agreed to pay its attorneys' fees. The fee award is affirmed.

### Attorneys' Fees and Costs on Appeal

¶ 62 UHC requests an award of attorneys' fees and costs on appeal. We decline to award fees. As the prevailing parties, Clinton, James, and UHC are entitled to their costs on appeal.

### CONCLUSION

¶ 63 We affirm the trial court's entry of summary judgment in favor of Clinton and James, and affirm the court's award of attorneys' fees in favor of UHC.

CONCURRING: MAURICE PORTLEY, Presiding Judge, and JOHN C. GEMMILL, Judge.